Jose PENA, Appellant,

v.

The STATE of Texas, Appellee.

No. 10–03–00109–CR.

Court of Appeals of Texas, Waco.

May 2, 2007.

Frank Blazek, Smither Martin Henderson & Blazek PC, Huntsville, R. Scott Ramsey, Houston, for appellant.

Whitney T. Smith, Leon County Dist. Atty., Centerville, Sue Korioth, Sue Korioth PC, Dallas, for appellee.

Prof. George Dix, University of Texas Law School, Keith S. Hampton, Austin, John R. Rolater, Jr., Asst. Dist. Atty. for Dallas County, Dallas, for other.

Harvey Angel, Gatesville, pro se.

Before Chief Justice GRAY, Justice VANCE, and Justice REYNA.

## OPINION ON REMAND

FELIPE REYNA, Justice.

A jury convicted Jose Pena of possessing marihuana in the amount of 5 pounds or more but less than 50 pounds and, after finding enhancement allegations true, assessed his punishment at life imprisonment. Pena contends in six points that: (1) the admission of evidence regarding the results of DPS lab testing of the plants seized from his van violated his rights under the Due Process Clause of the United States Constitution and the Due Course of Law provision of the Texas Constitution because the plants and the DPS file regarding the plants were lost or destroyed before trial; (2) the court abused its discretion by failing to grant a motion for new trial because of trial counsel's failure to raise a speedy trial claim and counsel's failure to request a mistake-of-fact instruction in the charge (two points); (3) he received ineffective assistance of counsel because of these failures (two points); and (4) he was denied due process and due course of law because of the State's failure to disclose *Brady* evidence before trial.

## I. Background

Department of Public Safety Trooper Mike Asby stopped Pena for a traffic violation. As Asby approached Pena's van, he smelled the odor of raw marihuana. Asby looked inside Pena's van and saw what he believed to be freshly cut marihuana covering the entire cargo area. According to Asby, Pena repeatedly denied that the plant material was marihuana. He could not recall whether Pena had informed him that he wanted the plants independently tested.[1] DPS criminalist Charles Mott tested the plant material and reported that it consisted of 23.46 pounds of marihuana.

Pena filed a motion for independent analysis of the plant material, which the trial court granted. Thereafter, it was discovered that the plant material and all records relating to the material had been destroyed. All that remained was a lab report stating that the plant material was marihuana, signed by Mott, and sent from the lab to Asby.

In a hearing outside the presence of the jury, Mott testified that he personally tested the material and found that it was 23.46 pounds of marihuana. Yet, he was unable to recall the material's weight from memory, how the material was contained, or how he took samples for testing. He also could not recall when it was tested.

Based upon a computer entry, Mott testified that he received a notice to dispose of the evidence and that it was destroyed one month later. However, Mott conceded that he did not know who sent the notice and stated that not only was the plant material destroyed, but the entire file containing the notice to destroy, the original

---

1. Pena's trial counsel suggested in his cross-examination of Asby that Pena had informed Asby "that he wanted not only to have ya'll test it but that he wanted to test it, too." Pena's counsel was reviewing the offense report as he questioned Asby.

worksheet, reports, letters, and submission forms was lost. He admitted that this had never occurred before or since, but he attributed the cause of the missing file to his lab's recent move to a new building.

The trial court took judicial notice of the fact that there was no destruction order from the trial court in the clerk's file. The district attorney testified that he did not sign an order for the destruction of the evidence. Asby, the only other person whom Mott believed could have requested the destruction, testified that he did not remember signing such an order.

Pena argued to the trial court that the report, and all testimony concerning the report, should be suppressed because the destruction of the marihuana violated his right to due process under the United States and his right to due course of law under the Texas Constitution. The trial court overruled Pena's objection. Pena also requested a limiting instruction, which the court denied.

## II. Fourteenth Amendment

■ Pena contends in his first issue that the admission of Mott's lab report and testimony violated his right to due process under the Fourteenth Amendment to the United States Constitution.

■ Because no independent analysis was ever done, it is undisputed that the destroyed plant material was only potentially exculpatory. When the State loses or destroys evidence which is only "potentially useful," the defendant must show that the State acted in bad faith to establish a due process violation under the Fourteenth Amendment. *Arizona v. Youngblood,* 488 U.S. 51, 58, 109 S.Ct. 333,

337, 102 L.Ed.2d 281 (1988); *McGee v. State,* 210 S.W.3d 702, 704 (Tex.App.-Eastland 2006, no pet.).

There is no evidence that DPS officials acted in bad faith when they destroyed the plant material or when they lost the accompanying records. Thus, Pena cannot prevail on his due process claim under the Fourteenth Amendment.

## III. Article I, Section 19

■ Nevertheless, Pena also contends in his first issue that the Due Course of Law provision in article I, section 19 of the Texas Constitution provides a greater level of protection than the Due Process Clause of the Fourteenth Amendment.[2]

The State argues that Pena has not preserved this aspect of his first issue for appellate review because he did not argue in the trial court that the Texas Constitution provides greater rights than the federal constitution. We disagree. Pena argued to the court that his rights under the Due Course of Law provision of the Texas Constitution were violated by the admission of this evidence. If, as the State contends, the federal and state provisions are synonymous, then Pena's objection under the Texas Constitution was meaningless.

Pena specifically objected to the trial court that the admission of Mott's testimony and the lab report would violate his right to due course of law under article I, section 19 of the Texas Constitution because the State had destroyed the seized plant material. This was sufficient to preserve this issue for appellate review. *See Sax v. Votteler,* 648 S.W.2d 661, 664 (Tex.

2. This Court raised this issue *sua sponte* on original submission. *See Pena v. State,* 166 S.W.3d 274 (Tex.App.Waco 2005), *vacated on other grounds,* 191 S.W.3d 133 (Tex.Crim.App. 2006). The Court of Criminal Appeals reaffirmed that an appellate court may address unassigned error but remanded this appeal so the parties could have an opportunity to brief this issue. *See Pena,* 191 S.W.3d at 136–38.

1983) (rejecting court of appeal's holding that "open courts" complaint was not preserved by plaintiff's objection that statute violated the "due process provisions of the United States and Texas Constitutions"); cf. *Heidelberg v. State,* 144 S.W.3d 535, 542–43 (Tex.Crim.App.2004) (holding state constitutional issue not preserved because of, among other things, "counsel's failure to cite to the state constitution").

■ Provisions of the Texas Constitution which have analogues in the federal constitution are generally interpreted to have the same meaning. The Texas Constitution should be interpreted as providing broader protection than its federal counterpart only if such an interpretation has "firm support in state history or policy." *Cobb v. State,* 85 S.W.3d 258, 267–68 (Tex.Crim.App.2002); *accord Ex parte Lewis,* No. PD–0577–05, 2007 WL 57823 *passim* (Tex.Crim.App. Jan. 10, 2007). Thus, the Texas Constitution should be interpreted as providing rights not found in the federal constitution "only when unique aspects of Texas history, jurisprudence, or law support that separate interpretation." *Cobb,* 85 S.W.3d at 268. And it is not appropriate to construe the Texas Constitution differently merely because this Court believes that federal precedent is incorrect. *See Cobb,* 85 S.W.3d at 267.

In *Lewis,* the Court of Criminal Appeals overturned its prior holding in *Bauder v. State* that the Double Jeopardy provision (article I, section 14) of the Texas Constitution provides more expansive protection in a case involving a prosecutor-induced mistrial than the Double Jeopardy Clause of the federal constitution. *Lewis,* 2007 WL 57823, at *1 (overruling *Bauder,* 921 S.W.2d 696 (Tex.Crim.App.1996)). The Court in so doing considered: (1) the historical context in which article I, section 14 of the Texas Constitution was framed, including: English common law, nineteenth

century decisions in other states, prior versions of the Texas Constitution, and nineteenth century decisions in Texas cases; (2) more recent decisions in Texas and other jurisdictions; and (3) practical considerations. *Id.,* 2007 WL 57823, at *14–26.

### A. Historical Context

In its present form (since 1876), the Due Course of Law provision of the Texas Constitution states:

No citizen of this State shall be deprived of life, liberty, property, privileges or immunities, or in any manner disfranchised, except by the due course of the law of the land.

TEX. CONST. art. I, § 19. This provision traces its Texas lineage to section 7 of the Declaration of Rights in the 1836 Constitution of the Republic of Texas. *See* REPUB. TEX. CONST. of 1836, DECLARATION OF RIGHTS, § 7, *reprinted in* 1 H.P.N. GAMMEL, THE LAWS OF TEXAS 1822–1897, at 1069, 1083 (Austin, Gammel Book Co. 1898).

The genesis for the due course of law provisions in the current and former Texas Constitutions is the Magna Carta. *Sax,* 648 S.W.2d at 664; TEX. CONST. art. I, § 19 interpretive commentary. Chapter 29 of the Magna Carta of 1225 provided:

No Freeman shall be taken, or imprisoned, or be disseised of his Freehold, or Liberties, or free Customs, or be outlawed, or exiled, or any other wise destroyed; nor will We not pass upon him, nor condemn him, but by lawful judgment of his Peers, or by the Law of the Land. We will sell to no man, we will not deny or defer to any man either Justice or Right.

EDWARD COKE, 2 INSTITUTES, *45.

Thus, according to the Magna Carta, a "Freeman" could not be "taken," "imprisoned," or "condemned" except by the "law-

ful judgment of his Peers, or by the Law of the Land." As Lord Coke explained, the term "the Law of the Land (that is, to speak it once for all) [means] by the due course, and process of Law." *Id.* at *46. He further observed:

> For the true sense and exposition of these words, see the Statute of 37. Edw. 3. cap. 8. where the words, by the law of the Land, are rendered, without due process of Law, for there it is said, though it be contained in the great Charter, that no man be taken, imprisoned, or put out of his free-hold without proces of the Law; that is, by indictment of presentment of good and lawfull men, where such deeds be done in due manner, or by writ original of the Common law.

*Id.* at *50.

The close relationship between these terms was early recognized by the Supreme Court of the United States.

> The words, "due process of law," were undoubtedly intended to convey the same meaning as the words, "by the law of the land," in *Magna Charta*. Lord Coke, in his commentary on those words, (2 Inst. 50,) says they mean due process of law. The constitutions which had been adopted by the several States before the formation of the federal constitution, following the language of the great charter more closely, generally contained the words, "but by the judgment of his peers, or the law of the land." The ordinance of congress of July 13, 1787, for the government of the territory of the United States northwest of the river Ohio, used the same words.

*Den v. Hoboken Land & Improvement Co.,* 59 U.S. (18 How.) 272, 276, 15 L.Ed. 372 (1855).

When Texas became an independent republic in 1836, there were twenty-four states. The constitutions of nineteen of them provided a due process protection similar to that found in the Magna Carta and may be placed in four general categories:[3]

- those providing that a person could not be deprived of life, liberty, property, etc. unless by the judgment of his peers or the law of the land;[4]

- those providing for the rights of an accused person and stating particularly that an accused may not be deprived of life, liberty, property, etc. unless by the judgment of his peers or the law of the land;[5]

- those providing that all courts should be open and/or that all persons should have for injuries done them a remedy by due course of law;[6] and

---

3. Some of these states had distinct open courts/remedies provisions and provisions governing the rights of the accused which each provided a due process protection similar to that found in the Magna Carta.

4. *See* ILL. CONST. of 1818, art. VIII, § 8; MD. DECLARATION OF RIGHTS of 1776, art. XXI; N.Y. CONST. of 1777, art. XIII; N.C. DECLARATION OF RIGHTS of 1776, art. XII; TENN. CONST. of 1796, art. XI, § 8; *see also* NW. TERRITORY ORDINANCE of 1787, § 14, art. II.

5. *See* DEL. CONST. of 1831, art. I, § 7; KY. CONST. of 1799, art. X, § 10; ME. CONST. of 1820, art. I, § 6; MASS. CONST. of 1780, pt. I,

art. XII; MO. CONST. of 1820, art. XIII, § 9; N.H. CONST. of 1784, pt. I, art. 15; PA. CONST. of 1790, art. IX, § 9; VT. CONST. of 1786, ch. I, art. XI; VA. DECLARATION OF RIGHTS of 1776, § 8.

6. *See* ALA. CONST. of 1819, art. I, § 14; CONN. CONST. of 1818, art. I, § 12; DEL. CONST. of 1831, art. I, § 9; IND. CONST. of 1816, art. I, § 11; ME. CONST. of 1820, art. I, § 19; MISS. CONST. of 1832, art. I, § 14; OHIO CONST. of 1802, art. VIII, § 7; PA. CONST. of 1790, art. IX, § 11; TENN. CONST. of 1835, art. I, § XVII; *see also* MD. DECLARATION OF RIGHTS of 1776, art. XVII ("every freeman, for any injury done him in his person or property, ought to have

- those providing for the rights of an accused person and stating particularly that an accused may not be deprived of life, liberty, property, etc. unless by due course of law.[7]

During the eighteenth and nineteenth centuries, the courts in these states uniformly followed Lord Coke's interpretation that the terms "the law of the land," "due process," and "due course of law" are synonymous.[8]

The Texians who served on the committee appointed to draft a constitution for the Republic[9] had for their consideration the federal constitution "and that of several southern states." John Cornyn, *The Roots of the Texas Constitution: Settlement to Statehood*, 26 TEX. TECH. L. REV.

1089, 1122 (1995). The committee proposed the following provision in the Declaration of Rights which would ultimately become the Texas due course of law guaranty:

> No citizen shall be taken, or imprisoned, or dispossessed of his freehold, liberties, or privileges, or outlawed, or exiled, or in any manner disfranchised, or deprived of his life, liberty or property, but by the law of the land.

DRAFT REPUB. TEX. CONST. of 1836, DECLARATION OF RIGHTS, § 8 (Mar. 9, 1836), *reprinted in* 1 GAMMEL, at 859, 869. The Convention considered the proposal and made some revisions before adopting the following as section 7 of the Declaration of Rights:

remedy, by the course of the law of the land").

7. *See* ALA. CONST. of 1819, art. I, § 10; CONN. CONST. of 1818, art. I, § 9; MISS. CONST. of 1832, art. I, § 10.

8. *See Dorman v. State*, 34 Ala. 216, 1859 WL 713, at *13 (1859); *In re Clark*, 65 Conn. 17, 31 A. 522, 526–27 (1894); *Wilson v. Balt. & Phila. R.R. Co.*, 5 Del.Ch. 524, 1884 WL 1743, at *8 (1884); *Rhinehart v. Schuyler*, 7 Ill. (2 Gilm.) 473, 1845 WL 3964, at *31 (1845); *Campbell v. Dwiggins*, 83 Ind. 473, 1882 WL 6936, at *5 (1882); *Doe ex dem. Gaines v. Buford*, 31 Ky. (1 Dana) 481, 1833 WL 2531, at *15 (1833); *In re Opinion of the Justices*, 58 Me. 590, 1871 WL 7826, at *3 (1871); *Regents of the Univ. of Md. v. Williams*, 9 G. & J. 365, 1838 WL 1372, at *30 (Md.1838); *Jones v. Robbins*, 74 Mass. (8 Gray) 329, 342–43, 1857 WL 5869, at *10 (1857); *Griffin v. Mixon*, 38 Miss. 424, 1860 WL 3138, at *14 (1860); *State v. Stein*, 2 Mo. 67, 1828 WL 1622, at *1 (1828); *Mayo v. Wilson*, 1 N.H. 53, 1817 WL 456, at *3 (1817); *Taylor v. Porter & Ford*, 4 Hill 140 (N.Y.Sup.Ct.1843); *State v. Moss*, 47 N.C. (2 Jones) 66, 1854 WL 1395, at *2 (1854); *Ex parte Bushnell*, 9 Ohio St. 77, 89, 1859 WL 2 (1859); *Palairet's Appeal*, 67 Pa. 479, 1871 WL 10920, at *5 (1871); *Zylstra v. Corp. of Charleston*, 1 S.C.L. (1 Bay) 382, 1794 WL 306, at *5 (1794); *State v. Staten*, 46

Tenn. (6 Cold.) 233, 1869 WL 2543, at * 4 (1869); *Quimby v. Hazen*, 54 Vt. 132, 1881 WL 7830, at *1 (1881); *Commonwealth v. Byrne*, 61 Va. (20 Gratt.) 165, 1871 WL 4845, at *13 (1871).

9. The delegates who assembled at Washington–on–the–Brazos "had relatively little time for deliberation or subtle refinements; they adopted the Constitution in what has been described as a 'state of panic.'" John Cornyn, *The Roots of the Texas Constitution: Settlement to Statehood*, 26 TEX. TECH. L. REV. 1089, 1120 (1995). This is evident from the haste with which the delegates adopted a declaration of independence and a constitution. On the first day of the Convention, March 1, 1836, the delegates elected Richard Ellis of Pecan Point as President of the Convention. Journals of the Convention of the Free, Sovereign and Independent People of Texas, in General Convention Assembled, *reprinted in* 1 H.P.N. GAMMEL, THE LAWS OF TEXAS 1822–1897, at 823, 824–25 (Austin, Gammel Book Co. 1898). President Ellis appointed a committee of 5 to draft a declaration of independence. *Id.* at 825–26. The Convention approved the Declaration drafted by that committee the next day. *Id.* at 837. Immediately preceding the report on the Declaration of Independence, President Ellis appointed a committee of 21 to draft a constitution. *Id.* at 834. This committee presented their proposed constitution one week later. *Id.* at 859.

No citizen shall be deprived of privileges, outlawed, exiled, or in any manner disfranchised, except by due course of the law of the land.

REPUB. TEX. CONST. of 1836, DECLARATION OF RIGHTS, § 7.

The Republic of Texas was granted statehood in 1845. As part of the annexation process, a new constitution had to be drafted.

> As the delegates met, they had before them the constitutions of most other states, of the United States, and of the Republic of Texas. During the Convention, examples from other constitutions were addressed as either worthy of emulation or as examples of what should be avoided. The recently completed but unratified Constitution of Louisiana was held up as a model so often that the President of the Convention, forty-one year old Thomas Jefferson Rusk of Nacogdoches, exclaimed:
>
> > I sincerely wish that the future Constitution of Louisiana had remained locked up until our labors were over. We have received no benefits from it, and have come very near to incorporating some articles which would have been ruinous to Texas. We can reflect for ourselves, and are capable of forming a Constitution for ourselves.
>
> Another disapproving delegate similarly claimed that he "discovered a disposition to make everything conformable as far as possible to the system of the Federal government." Nevertheless, the delegates would refer by name to the constitutions of twenty states, as well as that of the United States, during their debates. In order of frequency of citation, the delegates consulted the state constitutions of Alabama, Louisiana, Kentucky, Tennessee, Virginia, Pennsylvania, Mississippi, Arkansas, Illinois, Indiana, Ohio, Missouri, New York, North Carolina, Connecticut, Delaware, Georgia, Maine, Michigan, and South Carolina. Although state constitutions in the South were mentioned with relatively greater frequency—which is not surprising in light of where the delegates themselves hailed from and their common economic interest in the preservation of slavery—there was remarkable openness to examples set by states from all parts of the nation. Indeed, the constitutions of Pennsylvania and Mississippi were cited by the delegates with identical frequency, as were the constitutions of Arkansas, Illinois, Indiana, and Ohio. The *Charleston Courier* reported: "We need not say that the instrument is modelled upon the theory of most of our own state constitutions." The *New Orleans Picayune* concurred "that in its grand outline, as well as its details, it is too much like the constitutions of the old states to need elucidation." No single constitution, however, proved to be a template for the Texas document.

Cornyn, *supra*, 26 TEX. TECH. L. REV. at 1091–92 (footnotes omitted).[10]

Three states joined the Union while Texas was an independent republic. The constitutions of two of them provided a due process protection similar to that found in the Magna Carta and the states previously cited.[11] *See* ARK. CONST. of 1836,

---

10. Although the Texians paid much attention to the Louisiana Constitution of 1845, that constitution did not have any type of due process provision. Louisiana did not adopt a constitutional due process provision until its 1864 Constitution. *See* LA. CONST. of 1864, tit. VII, art. 110.

11. Michigan was the third of these states, but the Michigan Constitution of 1835 did not have a due process provision. Such a provision first appeared in the Michigan Constitution of 1850. *See* MICH. CONST. of 1850, art. VI, § 32. Michigan, like virtually all the other states, considered the terms "the law of the

art. II, § 10; FLA. CONST. of 1838, art. I, §§ 8, 9. And like the states before them, Arkansas and Florida courts in the nineteenth century considered the terms "the law of the land," "due process," and "due course of law" to be synonymous. *See Rison v. Farr*, 24 Ark. 161, 1865 WL 377, at *10 (1865); *Wooten v. State*, 24 Fla. 335, 5 So. 39, 43 (1888). In addition, Rhode Island adopted a new constitution while Texas was an independent republic which provided a similar due process protection. *See* R.I. CONST. of 1842, art. I, § 10. And the Supreme Court of Rhode Island construed its constitution in the same manner as these other states. *See State v. Keeran*, 1858 WL 2639, at *6–7, 5 R.I. 497, 505–06, 1858 R.I. LEXIS 72, at *15–17 (1858).

With this background, Texas adopted article I, section 16 in the Bill of Rights of the 1845 Constitution, which provided:

> No citizen of this State shall be deprived of life, liberty, property, or privileges, outlawed, exiled, or in any manner disfranchised, except by due course of the law of the land.

TEX. CONST. of 1845, art. I, § 16. The 1861 and 1866 Constitutions had identical provisions. *See* TEX. CONST. of 1866, art. I, § 16; TEX. CONST. of 1861, art. I, § 16.

At least one commentator has suggested that, (1) because of the inclusion of the phrase "or in any manner disfranchised," and (2) because the delegates to the 1836 Convention added the phrase "due course of" before "the law of the land," "the draft-

ers of the Texas Constitutions intended to go beyond the protection afforded by the federal Constitution" (and by implication, the constitutions of the other states). James C. Harrington, *The Texas Bill of Rights and Civil Liberties*, 17 TEX. TECH. L. REV. 1487, 1526 (1986). However, early Texas decisions suggest otherwise.

> [I]t must be held that the people intended, by [the Due Course of Law provision], in so far as it is identical with the fourteenth amendment, to place thereby just such restrictions on the powers of the legislature as the highest court in the nation has declared is the true construction of like language made a part of the constitution of the United States for the purpose of placing a limitation on the power of the legislatures of the several states.

*Mellinger v. City of Houston*, 68 Tex. 37, 3 S.W. 249, 253 (1887).[12]

> "Due process of law," as used in the fourteenth amendment, and "due course of the law of the land," as used in article 1, § 19, of the Constitution of Texas, and in the Constitutions of many of her sister states, according to the great weight of authority, are, in nearly if not all respects, practically synonymous.

*Mabee v. McDonald*, 107 Tex. 139, 175 S.W. 676, 679 (1915), *rev'd on other grounds, McDonald v. Mabee*, 243 U.S. 90, 37 S.Ct. 343, 61 L.Ed. 608 (1917); *accord Barnett v. State*, 42 Tex.Crim. 302, 62 S.W. 765, 770 (1900).

---

land," "due process," and "due course of law" to be synonymous. *See Sears v. Cottrell*, 5 Mich. 251, 1858 WL 4478, at *2 (Mich. 1858).

**12.** The Court of Criminal Appeals often relies on the decisions of the Supreme Court of Texas when addressing matters of state constitutional law. *See, e.g., Luquis v. State*, 72 S.W.3d 355, 365 (Tex.Crim.App.2002); *Ex parte Mitchell*, 977 S.W.2d 575, 580 (Tex.

Crim.App.1997); *Clewis v. State*, 922 S.W.2d 126, 131 (Tex.Crim.App.1996). The Supreme Court reciprocates. *See Davenport v. Garcia*, 834 S.W.2d 4, 14 (Tex.1992) (orig. proceeding) ("We give thoughtful consideration to that court's analysis in part to avoid conflicting methods of constitutional interpretation in our unusual system of bifurcated highest courts of appeal."); *see also Yanes v. Sowards*, 996 S.W.2d 849, 852 (Tex.1999) (per curiam).

Accordingly, when we view the Due Course of Law provision in article I, section 19 against this historical backdrop, we must conclude that the framers of the Texas Constitution intended that it be construed as "practically synonymous" with the Due Process Clause of the Fourteenth Amendment [13] and with comparable provisions in the constitutions of other states. *See Tex. Workers' Comp. Comm'n v. Patient Advocates of Tex.,* 136 S.W.3d 643, 658 (Tex.2004). However, this does not end our inquiry.

## B. Evolution of Due Process Jurisprudence

The United States Supreme Court has long recognized that due process is not a static concept.

We have held that the Due Process Clause of the Fourteenth Amendment incorporates most of the Bill of Rights against the States. It is tempting, as a means of curbing the discretion of federal judges, to suppose that liberty encompasses no more than those rights already guaranteed to the individual against federal interference by the express provisions of the first eight Amendments to the Constitution. But of course this Court has never accepted that view.

It is also tempting, for the same reason, to suppose that the Due Process Clause protects only those practices, defined at the most specific level, that were protected against government interference by other rules of law when the Fourteenth Amendment was ratified. But such a view would be inconsistent with our law. It is a promise of the Constitution that there is a realm of personal liberty which the government may not enter. We have vindicated this principle before. Marriage is mentioned nowhere in the Bill of Rights and interracial marriage was illegal in most States in the 19th century, but the Court was no doubt correct in finding it to be an aspect of liberty protected against state interference by the substantive component of the Due Process Clause in *Loving v. Virginia,* 388 U.S. 1, 12, 87 S.Ct. 1817, 1824, 18 L.Ed.2d 1010 (1967)....

Neither the Bill of Rights nor the specific practices of States at the time of the adoption of the Fourteenth Amendment marks the outer limits of the substantive sphere of liberty which the Fourteenth Amendment protects. As the second Justice Harlan recognized:

"[T]he full scope of the liberty guaranteed by the Due Process Clause cannot be found in or limited by the precise terms of the specific guarantees elsewhere provided in the Constitution. This 'liberty' is not a series of isolated points pricked out in terms of the taking of property; the freedom of speech, press, and religion; the right to keep and bear arms; the freedom from unreasonable searches and seizures; and so on. It is a rational continuum which, broadly speaking, includes a freedom from all substantial arbitrary impositions and purposeless restraints, ... and which also recognizes, what a reasonable and sensitive judgment must, that certain interests require particularly careful scrutiny of the state needs asserted to justify their abridgment."

---

**13.** To be more precise, the Fourteenth Amendment *was not ratified until 1868, so it* necessarily had no influence on the drafting of Texas's earlier constitutions. Rather, the Due Process Clause of the Fifth Amendment *was the comparable federal provision for* those documents.

*Planned Parenthood of Se. Pa. v. Casey,* 505 U.S. 833, 847–48, 112 S.Ct. 2791, 2804–05, 120 L.Ed.2d 674 (1992) (quoting *Poe v. Ullman,* 367 U.S. 497, 543, 81 S.Ct. 1752, 1776–77, 6 L.Ed.2d 989 (1961) (Harlan, J., dissenting)) (other citations omitted).

In another case, the Court observed that procedural due process "formulates a concept less rigid and more fluid than those envisaged in other specific and particular provisions of the Bill of Rights." *County of Sacramento v. Lewis,* 523 U.S. 833, 850, 118 S.Ct. 1708, 1719, 140 L.Ed.2d 1043 (1998) (quoting *Betts v. Brady,* 316 U.S. 455, 462, 62 S.Ct. 1252, 1256, 86 L.Ed. 1595 (1942)); *see also Guardian Royal Exch. Assurance, Ltd. v. English China Clays, P.L.C.,* 815 S.W.2d 223, 230 (Tex.1991) ("the parameters of personal jurisdiction have evolved as the United States Supreme Court has continued to examine, develop and refine the permissible reach of federal due process").

Thus, the United States Supreme Court considers historical practice, contemporary jurisprudence, and "fundamental fairness" in evaluating an issue involving a defendant's right to procedural due process. *See Cooper v. Oklahoma,* 517 U.S. 348, 356–67, 116 S.Ct. 1373, 1377–83, 134 L.Ed.2d 498 (1996). The Court has emphasized that historical practice is a "primary guide" in this inquiry. *Montana v. Egelhoff,* 518 U.S. 37, 43–44, 116 S.Ct. 2013, 2017–18, 135 L.Ed.2d 361 (1996) (citing *Medina v. California,* 505 U.S. 437, 446, 112 S.Ct. 2572, 2577–78, 120 L.Ed.2d 353 (1992)). Nevertheless, as Justice O'Connor observed in her concurring opinion in *Medina,* historical considerations are not the sole basis for determining this type of claim:

> While I agree with the Court that historical pedigree can give a procedural practice a presumption of constitutionali-

ty, the presumption must surely be rebuttable.

The concept of due process is, "perhaps, the least frozen concept of our law—the least confined to history and the most absorptive of powerful social standards of a progressive society. But neither the unfolding content of 'due process' nor the particularized safeguards of the Bill of Rights disregard procedural ways that reflect a national historic policy." Against the historical status quo, I read the Court's opinion to allow some weight to be given countervailing considerations of fairness in operation, considerations much like those we evaluated in *Mathews* [*v. Eldridge,* 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976) ]. Any less charitable reading of the Court's opinion would put it at odds with many of our criminal due process cases, in which we have required States to institute procedures that were neither required at common law nor explicitly commanded by the text of the Constitution. *See, e.g., Griffin v. Illinois* [351 U.S. 12, 76 S.Ct. 585, 100 L.Ed. 891 (1956) ], *supra,* (due process right to trial transcript on appeal); *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963) (due process right to discovery of exculpatory evidence); *Sheppard v. Maxwell,* 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966) (due process right to protection from prejudicial publicity and courtroom disruptions); *Chambers v. Mississippi,* 410 U.S. 284, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973) (due process right to introduce certain evidence); *Gagnon v. Scarpelli,* 411 U.S. 778, 93 S.Ct. 1756, 36 L.Ed.2d 656 (1973) (due process right to hearing and counsel before probation revoked); *Ake v. Oklahoma* [470 U.S. 68, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985) ], *supra* (due process right to psychiatric examination when sanity is significantly in question).

*Medina,* 505 U.S. at 454, 112 S.Ct. at 2582 (O'Connor, J., concurring) (some citations omitted).

The Supreme Court of Texas has likewise observed that constitutional interpretation cannot rest solely on historical practice. In *In the Interest of J.W.T.,* the Court considered whether under the Due Course of Law provision of the Texas Constitution a biological father who is not married to the mother of his child may be denied the opportunity to establish paternity and claim parental rights in court. 872 S.W.2d 189, 189 (Tex.1994). In analyzing this claim, the Court acknowledged that acceptance of such a contention "would have been highly improbable at the time of the ratification of our Texas Constitution in 1876." *Id.* at 191. But the Court also observed that "[s]ignificant twentieth century changes in the resolution of issues affecting the family are reflected in statutes, demographics, alteration of social attitudes toward illegitimate children, and decisions of the Texas courts." *Id.* at 193.

In *Edgewood Independent School District v. Kirby,* the Court observed:

> The Texas Constitution derives its force from the people of Texas. This is the fundamental law under which the people of this state have consented to be governed. In construing the language of [the Texas Constitution], we consider "the intent of the people who adopted it." In determining that intent, "the history of the times out of which it grew and to which it may be rationally supposed to have direct relationship, the evils intended to be remedied and the good to be accomplished, are proper subjects of inquiry." However, because of the difficulties inherent in determining the intent of voters over a century

ago, we rely heavily on the literal text. We seek its meaning with the understanding that the Constitution was ratified to function as an organic document to govern society and institutions *as they evolve through time.*

777 S.W.2d 391, 394 (Tex.1989) (emphasis added) (citations omitted); *see also Weiner v. Wasson,* 900 S.W.2d 316, 322 (Tex.1995) (Owen, J., dissenting) ("Over the years our Court gradually has expanded the reach of [the open courts] provision.").

In a similar vein, our state supreme court has observed that procedural due process under the Texas Constitution "is a flexible concept." *U.S. Gov't v. Marks,* 949 S.W.2d 320, 326 (Tex.1997); *accord Univ. of Tex. Med. Sch. v. Than,* 901 S.W.2d 926, 930 (Tex.1995). Therefore, in addition to considering the historical context in which article I, section 19 was adopted, we also consider more recent decisions in Texas and other jurisdictions and other relevant, practical considerations. *See Lewis,* 2007 WL 57823, at *14–26; *J.W.T.,* 872 S.W.2d at 194–97 & n. 19; *Edgewood Indep. Sch. Dist.,* 777 S.W.2d at 398.

### C. Recent Decisions

Texas courts have followed *Arizona v. Youngblood* fairly consistently since it was handed down in 1988. *See McGee,* 210 S.W.3d at 704; *Williams v. State,* 946 S.W.2d 886, 893 (Tex.App.-Waco 1997, no pet.); *Mahaffey v. State,* 937 S.W.2d 51, 53 (Tex.App.-Houston [1st Dist.] 1996, no pet.); *Gamboa v. State,* 774 S.W.2d 111, 112–13 (Tex.App.-Fort Worth 1989, pet. ref'd); *but see Ex parte Brandley,* 781 S.W.2d 886, 894 (Tex.Crim.App.1989) (reciting *Youngblood's* bad-faith standard but finding due process violation without an express finding of bad faith [14]).

---

**14.** In a dissenting opinion, Judge Campbell criticized the majority for finding a due pro-

And at least seven Texas courts (including this one) have applied the *Youngblood* bad-faith requirement to claims arising under the Texas Constitution's Due Course of Law provision. *See McGee*, 210 S.W.3d at 705; *Alvarado v. State*, No. 07–06–086–CR, 2006 WL 2860973, at *3 (Tex.App.-Amarillo Oct. 9, 2006, no pet.) (not designated for publication); *Salazar v. State*, 185 S.W.3d 90, 92–93 (Tex.App.-San Antonio 2005, no pet.); *Jackson v. State*, 50 S.W.3d 579, 588–89 (Tex.App.-Fort Worth 2001, pet. ref'd); *Williams*, 946 S.W.2d at 893; *Mahaffey*, 937 S.W.2d at 53; *State v. Rudd*, 871 S.W.2d 530, 533 (Tex.App.-Dallas 1994, no pet.).

However, only four [15] Texas courts have specifically addressed a contention that something other than the *Youngblood* bad-faith standard should apply to claims arising under the Texas Due Course of Law provision, and those four courts have agreed that the *Youngblood* standard should apply. *McGee*, 210 S.W.3d at 705; *Alvarado*, 2006 WL 2860973, at *3; *Salazar*, 185 S.W.3d at 92–93; *Rudd*, 871 S.W.2d at 533. Courts in twenty-three other states have likewise concluded that the *Youngblood* bad-faith requirement applies to claims arising under their respective constitutions.[16]

Conversely, courts in twelve states have considered this issue and have determined that a different standard should apply.[17] Fourteen states have not addressed this

cess violation because "there is no evidentiary support" for a finding of bad faith. *Ex parte Brandley*, 781 S.W.2d 886, 914–15 (Tex.Crim. App.1989) (Campbell, J., dissenting).

**15.** Excluding this Court's prior decision in this case, which has been set aside. *See Pena*, 166 S.W.3d at 281–82, *vacated on other grounds*, 191 S.W.3d 133 (Tex.Crim.App. 2006).

**16.** *See State v. Vickers*, 180 Ariz. 521, 885 P.2d 1086, 1093 (1994); *Lee v. State*, 327 Ark. 692, 942 S.W.2d 231, 234–35 (1997); *People v. Cooper*, 53 Cal.3d 771, 281 Cal.Rptr. 90, 809 P.2d 865, 886 (1991); *People v. Danielly*, 274 Ill.App.3d 358, 210 Ill.Dec. 671, 653 N.E.2d 866, 869–70 & n. 1 (1995); *Terry v. State*, 857 N.E.2d 396, 406 n. 8 (Ind.Ct.App.2006); *State v. Dulaney*, 493 N.W.2d 787, 791–92 (Iowa 1992); *State v. Finley*, 273 Kan. 237, 42 P.3d 723, 728 (2002); *Collins v. Commonwealth*, 951 S.W.2d 569, 572–73 (Ky.1997); *State v. Anderson*, 724 A.2d 1231, 1233–34 (Me.1999); *Patterson v. State*, 356 Md. 677, 741 A.2d 1119, 1128–30 (1999); *People v. O'Donnell*, No. 182699, 1998 WL 2016617, at *1 (Mich. Ct.App.1998) (per curiam) (not designated for publication); *State v. Smith*, 157 S.W.3d 687, 690–91 (Mo.Ct.App.2004); *State v. Davlin*, 263 Neb. 283, 639 N.W.2d 631, 647 (2002); *State v. Hunt*, 345 N.C. 720, 483 S.E.2d 417, 420–21 (1997); *State v. Caldwell*, 79 Ohio

App.3d 667, 607 N.E.2d 1096, 1098, 1101–03 (1992); *Ochoa v. State*, 963 P.2d 583, 595 (Okla.Crim.App.1998); *Commonwealth v. Free*, 902 A.2d 565, 569 (Pa.Super.Ct.2006); *State v. Vanover*, 721 A.2d 430, 433 (R.I. 1998); *State v. Engesser*, 661 N.W.2d 739, 754–56 (S.D.2003); *Mullins v. Commonwealth*, No. 1250–94–3, 1996 WL 343953, at *5 (Va.Ct.App. June 25, 1996) (not designated for publication); *State v. Wittenbarger*, 124 Wash.2d 467, 880 P.2d 517, 523–24 (1994); *State v. Greenwold*, 189 Wis.2d 59, 525 N.W.2d 294, 298 (1994); *Tortolito v. State*, 885 P.2d 864, 871–72 (Wyo.1994), *opinion withdrawn*, 901 P.2d 387 (Wyo.1995).

**17.** *See Gurley v. State*, 639 So.2d 557, 567 (Ala.Crim.App.1993); *Thorne v. Dep't of Pub. Safety*, 774 P.2d 1326, 1331 (Alaska 1989); *State v. Estrella*, 277 Conn. 458, 893 A.2d 348, 363–64 (2006); *Lolly v. State*, 611 A.2d 956, 960 (Del.1992); *State v. Matafeo*, 71 Haw. 183, 787 P.2d 671, 673–74 (1990); *State v. Fain*, 116 Idaho 82, 774 P.2d 252, 261–67, *cert. denied*, 493 U.S. 917, 110 S.Ct. 277, 107 L.Ed.2d 258 (1989); *Commonwealth v. Phoenix*, 409 Mass. 408, 567 N.E.2d 193, 196 & n. 1 (1991); *State v. Smagula*, 133 N.H. 600, 578 A.2d 1215, 1217–18 (1990); *State v. Ware*, 118 N.M. 319, 881 P.2d 679, 682–83 (1994); *State v. Ferguson*, 2 S.W.3d 912, 916–17 (Tenn. 1999); *State v. Delisle*, 162 Vt. 293, 648 A.2d 632, 642–43 (1994); *State v. Osakalumi*, 194 W.Va. 758, 461 S.E.2d 504, 511–14 (1995).

issue.[18]

Although a majority of the states which have addressed the issue have determined that *Youngblood* should apply to state constitutional due process claims, a significant minority has rejected this approach, and a substantial number of states has not even addressed the issue. Therefore, no clear consensus has emerged.[19]

### D. Practical Considerations

The legal landscape has changed significantly in the nineteen years since *Youngblood* was decided, particularly in the field of evidence preservation.

The gist of Larry Youngblood's complaint was that the State of Arizona had failed to preserve seven semen samples which had been collected from the body and clothing of the 10–year–old boy whom he had been convicted of sexually assaulting. *Youngblood,* 488 U.S. at 52, 109 S.Ct. at 334. The Supreme Court rejected Youngblood's contention that the Due Process Clause required preservation of such "potentially exculpatory" evidence because:

- "[w]henever potentially exculpatory evidence is permanently lost, courts face the treacherous task of divining the import of materials whose contents are unknown and, very often, disputed"; and

- the Court was unwilling "to read the 'fundamental fairness' requirement of the Due Process Clause as imposing on the police an undifferentiated and absolute duty to retain and to preserve all material that might be of conceivable evidentiary significance in a particular prosecution."

*Id.* at 57–58, 109 S.Ct. at 337 (quoting *California v. Trombetta,* 467 U.S. 479, 486, 104 S.Ct. 2528, 2533, 81 L.Ed.2d 413 (1984)) (other citation omitted).

Since 1989, however, the "import" of evidence containing biological material like that which was not preserved in Youngblood's case has been magnified substantially. Between 1989 and 2003, at least 144 men and women were exonerated by DNA evidence after having been convicted of murder or rape. Samuel R. Gross et al., *Exonerations in the United States 1989 through 2003,* 95 J.Crim. L. & Criminology 523, 523–24, 529 (2005). The Innocence Project states that "[t]here have been 200 post-conviction DNA exonerations in the United States." The Innocence Project, Facts on Post-Conviction DNA Exonerations (2007), *available at* http://www.innocenceproject.org/Content/ 351.php. Ironically, Larry Youngblood is one of those who has been exonerated. Barbara Whitaker, *DNA Frees Inmate Years After Justices Rejected Plea,* N.Y. Times, Aug. 11, 2000.

---

**18.** The states which have not decided this issue are Colorado, Florida, Georgia, Louisiana, Minnesota, Mississippi, Montana, Nebraska, New York, Nevada, New Jersey, North Dakota, Oregon, South Carolina, and Utah. At least one commentator contends that Minnesota adopted a different standard in *State v. Schmid,* 487 N.W.2d 539, 541–42 (Minn.Ct.App.1992). *See* Daniel R. Dinger, *Should Lost Evidence Mean a Lost Chance to Prosecute?: State Rejections of the United States Supreme Court Decision in Arizona v. Youngblood,* 27 Am. J.Crim. L. 329, 356–57 (2000). However, more recent Minnesota decisions do not reflect the adoption of any independent state constitutional standard. *See, e.g., State v. Heath,* 685 N.W.2d 48, 55–56 (Minn.Ct.App.2004).

**19.** It is noteworthy that the decisions in eight of the twenty-four states (including Texas) which have decided to follow *Youngblood* for state constitutional due process claims were by intermediate appellate courts and not by the court of last resort in those states. Conversely, in the twelve states which have declined to follow *Youngblood,* the highest court with criminal jurisdiction was the one that made the decision.

**648**

Focusing more closely on Texas, twenty-six men have been exonerated by post-conviction DNA testing in this state as of February 2007. Jeff Carlton, *Dallas County DA Agrees to Let Group Review Cases for DNA Testing*, DALLAS MORNING NEWS, Feb. 17, 2007. The governor pardoned another even more recently. Jennifer Emily, *Dallas Man Pardoned in Wrongful Rape Conviction*, DALLAS MORNING NEWS, Mar. 10, 2007.

In response to the unique problem of wrongful convictions in Dallas County,[20] the Dallas County District Attorney "has agreed to allow the Innocence Project of Texas to review whether DNA tests should be done in any of the cases of 354 people convicted of rapes, murders and other felonies as far back as 1970." Steve McGonigle, *Innocence Project to Review Dallas County Convictions*, DALLAS MORNING NEWS, Feb. 16, 2007. In a similar situation arising from problems with the crime lab operated by the Houston Police Department, 370 cases with DNA evidence were referred to private labs for retesting.[21] Roma Khanna & Steve McVicker, *'Trace' Drug Cases on Hold*, HOUSTON CHRON., July 3, 2003, at A1. Problems with the HPD crime lab "prompted the review of 1,300 cases it investigated" and led to the pardon of at least one man who was wrongfully convicted. Roma Khanna, *DA Supports Move to Pardon Sutton*, HOUSTON CHRON., June 28, 2003, at A1; *see also* Roma Khanna, *Perry Signs Pardon for Sutton*, HOUSTON CHRON., May 15, 2004, at A1.

The Texas Legislature has enacted several statutes since *Youngblood* which fur-

ther serve to highlight the importance of preserving evidence. Most notably, the Legislature enacted Chapter 64 of the Code of Criminal Procedure in 2001 to provide convicted persons a procedural vehicle for post-conviction DNA testing. *See* Act of Apr. 3, 2001, 77th Leg., R.S., ch. 2, § 2, 2001 Tex. Gen. Laws 2, 2–4 (codified at TEX.CODE CRIM. PROC. ANN. ch. 64). In tandem with this legislation, the Legislature also enacted a statute requiring the State to preserve evidence containing biological material:

(1) until the inmate is executed, dies, or is released on parole, if the defendant was convicted of a capital felony; or

(2) until the defendant dies, completes the defendant's sentence, or is released on parole or mandatory supervision, if the defendant is sentenced to a term of confinement or imprisonment.

Act of Apr. 3, 2001, 77th Leg., R.S., ch. 2, § 1, 2001 Tex. Gen. Laws 2, 2 (codified at TEX.CODE CRIM. PROC. ANN. art. 38.43).

In 2001, the Legislature also made significant revisions to the statute providing for compensation to persons wrongfully imprisoned. *See* Act of May 27, 2001, 77th Leg., R.S., ch. 1488, § 1, 2001 Tex. Gen. Laws 5280, 5280–83 (codified at TEX. CIV. PRAC. & REM.CODE ANN. ch. 103). Those revisions included:

- eliminating the requirement that the defendant must have pleaded "not guilty" to be eligible for compensation;
- eliminating the requirement that a pardon is required before a defendant is eligible for compensation (instead

**20.** At the time of the article, "DNA evidence ha[d] exonerated 12 Dallas County men since 2001, which is more than all but two states, according to the Innocence Project." Jeff Carlton, *Dallas County DA Agrees to Let Group Review Cases for DNA Testing*, DALLAS MORNING NEWS, Feb. 17, 2007.

**21.** An independent audit of the HPD crime lab uncovered "deficiencies ranging from potential contamination of evidence to lack of basic recordkeeping." Roma Khanna & Peggy O'Hare, *More Crime Lab Cases Earmarked for Review*, HOUSTON CHRON., Feb. 7, 2003, at A1.

allowing compensation if the defendant is pardoned or if the defendant "has been granted relief on the basis of actual innocence");

- providing an administrative procedure for compensation benefits of $25,000 per year of wrongful imprisonment up to $500,000; and

- increasing the damages cap from $50,000 to $500,000 in a suit filed for compensation benefits.

*Id.*

In 2003, the Legislature established a crime laboratory accreditation process. *See* Act of May 28, 2003, 78th Leg., R.S., ch. 698, § 4, 2003 Tex. Gen. Laws 2128, 2128–29 (codified at TEX. GOV' T CODE ANN. § 411.0205). In that same legislation, article 38.35 of the Code of Criminal Procedure (which concerns "Forensic Analysis of Evidence") was amended to provide that evidence subjected to forensic analysis and testimony regarding that evidence is not admissible in a criminal case if the analysis was performed at a laboratory not accredited under section 411.0205. *See* Act of May 28, 2003, 78th Leg., R.S., ch. 698, § 3, 2003 Tex. Gen. Laws 2128, 2128 (codified at TEX.CODE CRIM. PROC. ANN. art. 38.35(d), (e)).

In response to the difficulties at the HPD crime lab, the Legislature enacted legislation in 2005 creating the Texas Forensic Science Commission. *See* Act of May 30, 2005, 79th Leg., R.S., ch. 1224, § 1, 2005 Tex. Gen. Laws 3952, 3952–53 (codified at TEX.CODE CRIM. PROC. ANN. art. 38.01); *see also* JOHN WHITMIRE, SENATE

DISTRICT 15 LEGISLATIVE REPORT, at 3 (Fall 2005); Steve McVicker, *Crime Lab Watchdog Bill Sent to Perry*, HOUSTON CHRON., May 31, 2005, at B1. The Forensic Science Commission was created so Texas would have:

a process in place to conduct independent external investigation into allegations of serious negligence or misconduct substantially affecting the integrity of any forensic laboratory system, medical examiner's office, coroner's office, law enforcement storage facility, or medical facility in the state that processes criminal forensic science used in criminal proceedings.

SEN. COMM. ON CRIM. JUSTICE, BILL ANALYSIS, S.B. 1263, 79th Leg., R.S. (2005).[22]

The 79th Legislature also acted to enhance the crime laboratory accreditation process. *See* Act of May 30, 2005, 79th Leg., R.S., ch. 1224, § 3, 2005 Tex. Gen. Laws 3952, 3954–55 (amending TEX. GOV'T CODE ANN. § 411.0205).

Pena's case does not involve DNA evidence. Nonetheless, there have been at least three different occasions in the last eight years in which more than 150 persons in Texas have been either wrongfully accused of crimes involving narcotics or the accusations were called into question because of tainted evidence.

Forty-six men and women were falsely arrested for selling narcotics in Tulia, Texas in 1999, and thirty-eight of them were convicted. Melissa Drosjack, *Perry Signs Bill to Free Tulia 13*, HOUSTON CHRON., June 3, 2003, at A13. In response to the

---

**22.** The creation of this commission also makes Texas eligible for federal funding under "the Justice for All Act and the Paul Coverdell Forensic Sciences Improvement Grant Program." SEN. COMM. ON CRIM. JUSTICE, BILL ANALYSIS, S.B. 1263, 79th Leg., R.S. (2005). Title IV of the federal Justice for All Act of 2004 is known as the Innocence Pro-

tection Act of 2004 and, among other things, provides for post-conviction DNA testing and for federal "incentive grants" for states which provide post-conviction DNA testing. *See* Justice for All Act of 2004, H.R. 5107, 108th Cong. §§ 401–432, Pub.L. No. 108–405, 118 Stat. 2260, 2278–93.

Tulia scandal, the Texas Legislature unanimously approved an amendment to article 11.65 of the Code of Criminal Procedure allowing thirteen of those arrested and convicted to be released on bond pending resolution of their habeas applications.[23] *Id.;* SEN. COMM. ON CRIM. JUSTICE, BILL ANALYSIS, S.B.1948, 77th Leg., R.S. (2003). Governor Perry ultimately pardoned thirty-five of the thirty-eight who were convicted. Polly Ross Hughes, *Perry Pardons 35 in Tulia Sting,* HOUSTON CHRON., Aug. 23, 2003, at A1.

In November 2000, twenty-eight men and women were arrested in Hearne, Texas for possessing or distributing crack cocaine based on alleged transactions with a confidential informant. James Kimberly, *ACLU to File Suit, Alleges Racism in Hearne Drug Bust,* HOUSTON CHRON., Nov. 1, 2002, at A1; *see also Kelly v. State,* 151 S.W.3d 683 (Tex.App.-Waco 2004, no pet.).[24] The prosecutor ultimately dismissed the charges in seventeen of these cases because of "tainted evidence." *Tainted Evidence Blamed as 17 Drug Cases Dropped,* HOUSTON CHRON., Apr. 5, 2001, at A28.

And prosecutors in Dallas County had to dismiss eighty-six drug cases filed in connection with arrests dating from 2000–2001 after it was discovered that the alleged controlled substances were actually composed of mostly gypsum. *Arrests May Cost Millions/Dallas Faces Suits in False*

*Drug Busts,* HOUSTON CHRON., Oct. 10., 2002, at A38. "Nearly half of all purported cocaine Dallas police seized [in 2001] was finely crushed Sheetrock, while one-fourth of the methamphetamine turned out to be composed of gypsum, the main ingredient in Sheetrock." *Cocaine Tips Turn Out to Be a Real Snow Job,* HOUSTON CHRON., Jan. 7, 2002, at A19.

This review of the last two decades demonstrates the import of preserving potentially exculpatory evidence, particularly in cases involving some form of laboratory analysis. Indeed, the unique problems seen in Texas during the last decade provide considerable impetus toward a conclusion that "fundamental fairness" demands preservation of potentially exculpatory evidence.[25] *See Cobb,* 85 S.W.3d at 268 (Texas Constitution should be interpreted more broadly "only when unique aspects of Texas history, jurisprudence, or law support that separate interpretation").

### E. Summary

The historical backdrop for the Due Course of Law provision in the Texas Constitution demonstrates that the framers intended for this provision to be interpreted consistent with the Due Process Clause of the federal constitution. However, there is no clear consensus among our sister states regarding whether *Youngblood* should apply to state constitutional due

---

23. With regard to the other three who were convicted, one was on deferred adjudication community supervision and not eligible for a pardon, while the other two were not eligible because of convictions on other charges. Polly Ross Hughes, *Perry Pardons 35 in Tulia Sting,* HOUSTON CHRON., Aug. 23, 2003, at A1.

24. Regina Kelly was one of those arrested. James Kimberly, *ACLU to File Suit, Alleges Racism in Hearne Drug Bust,* HOUSTON CHRON., Nov. 1, 2002, at A1. In this Court, she sought to appeal the trial court's denial of her motion for disclosure of grand jury proceedings. *Kel-*

*ly v. State,* 151 S.W.3d 683, 684 (Tex.App.-Waco 2004, no pet.). We concluded that we did not have jurisdiction to hear such an appeal. *Id.* at 686–87.

25. DPS already recognizes the importance of preserving such evidence. Mott, who had been the supervisor for the DPS lab in Waco for thirty-seven years, testified that this is the only time in his recollection that the lab has lost or destroyed this type of evidence before trial.

process claims. The Texas experience in the last decade and the national experience of the last two decades reinforces the concerns expressed by those twelve states which have determined that the *Youngblood* standard is not adequate to address the loss or destruction of potentially exculpatory evidence.

> [C]oncern about the injustice that results from the conviction of an innocent person has long been at the core of our criminal justice system. That concern is reflected, for example, in the "fundamental value determination of our society that it is far worse to convict an innocent man than to let a guilty man go free."

*Schlup v. Delo,* 513 U.S. 298, 325, 115 S.Ct. 851, 866, 130 L.Ed.2d 808 (1995) (quoting *In re Winship,* 397 U.S. 358, 372, 90 S.Ct. 1068, 1077, 25 L.Ed.2d 368 (1970) (Harlan, J., concurring)).

■ Therefore, we join those twelve states and hold that, under the Due Course of Law provision of article I, section 19, the State has a duty to preserve material evidence which has apparent exculpatory value, encompassing both exculpatory evidence and evidence that is potentially useful to the defense.

### F. Appropriate Standard

The states which have adopted a different standard than *Youngblood* apply various balancing tests to determine whether the loss or destruction of potentially exculpatory evidence violates a defendant's right to due process under those states' respective constitutions. *See* Daniel R. Dinger, *Should Lost Evidence Mean a Lost Chance to Prosecute?: State Rejections of the United States Supreme Court Decision in Arizona v. Youngblood,* 27 Am. J.Crim. L. 329, 356–61 (2000).

The largest number of these states employs the balancing test enunciated by the Delaware Supreme Court in *Deberry v. State* or a similar balancing test. 457 A.2d 744, 752 (Del.1983) (cited with approval by *Lolly v. State,* 611 A.2d 956, 960 (Del. 1992)). In *Deberry,* the Delaware Supreme Court determined that the following three factors should be weighed to decide whether a defendant's state constitutional due process rights have been violated by the State's failure to preserve potentially exculpatory evidence:

(1) would the evidence have been subject to discovery or disclosure;

(2) if so, did the state have a duty to preserve the evidence; and

(3) if there was a duty to preserve, was that duty breached, and what consequences should flow from the breach.

*See id.* at 750. With regard to the third element of this analysis, the Court observed:

> [W]e draw a balance between the nature of the State's conduct and the degree of prejudice to the accused. The State must justify the conduct of the police or prosecutor, and the defendant must show how his defense was impaired by loss of the evidence. In general terms, the court should consider "(1) the degree of negligence or bad faith involved, (2) the importance of the lost evidence, and (3) the sufficiency of the other evidence adduced at the trial to sustain the conviction." *United States v. Loud Hawk,* 628 F.2d 1139, 1152 (9th Cir.1979) (Kennedy, J., concurring) (quoting *United States v. Higginbotham,* 539 F.2d 17, 21 (9th Cir.1976)).

*Id.* at 752. Four other states have adopted a virtually identical balancing test. *See Gurley v. State,* 639 So.2d 557, 566–67 (Ala.Crim.App.1993); *State v. Ferguson,* 2 S.W.3d 912, 917 (Tenn.1999); *State v. Delisle,* 162 Vt. 293, 648 A.2d 632, 642–43

(1994); *State v. Osakalumi*, 194 W.Va. 758, 461 S.E.2d 504, 511–12 (1995).

The various balancing tests employed by the other seven states which have rejected the *Youngblood* standard are substantially similar.

> The state's good or bad faith in failing to preserve the videotape is relevant to determining the appropriate sanction. We look to the degree of culpability on the part of the state, the importance of the evidence lost, the prejudice suffered by the accused, and the evidence of guilt adduced at the trial or hearing.

*Thorne v. Dep't of Pub. Safety*, 774 P.2d 1326, 1331 (Alaska 1989).

> [W]e weigh the reasons for the unavailability of the evidence, the materiality of the missing evidence, the likelihood of mistaken interpretation of it by witnesses or the jury and the prejudice to the defendant. The first factor scrutinizes the state's involvement, and the remaining three examine the impact on the trial.

*State v. Estrella*, 277 Conn. 458, 893 A.2d 348, 364 (2006) (citation omitted).

The balancing test in Hawaii focuses on: (1) whether the state acted in bad faith in losing or destroying the evidence; (2) "the favorableness of the evidence"; and (3) "the prejudice suffered by the defendant as a result of its loss." *State v. Matafeo*, 71 Haw. 183, 787 P.2d 671, 673 (1990).

The Supreme Court of Idaho endorsed an approach which is:

> cognizant of the degree and weight of the evidence accumulated against the defendant as well as the degree of culpability of the State in failing to preserve material evidence. Indeed, a strong line of cases do more than just recognize the relative strengths and weaknesses of those variables, but actively balance the magnitude of the State's failure to perform its duty to preserve evidence against the degree of prejudice thereby sustained by the defendant.

*State v. Fain*, 116 Idaho 82, 774 P.2d 252, 265 (1989).

> When potentially exculpatory evidence is lost or destroyed, a balancing test is employed to determine the appropriateness and extent of remedial action. The courts must weigh the culpability of the Commonwealth, the materiality of the evidence and the potential prejudice to the defendant.

*Commonwealth v. Phoenix*, 409 Mass. 408, 567 N.E.2d 193, 196 (1991).

> Once a defendant demonstrates that the State has failed to preserve apparently relevant evidence, the State has the burden of showing that it acted in good faith, in the sense that it had no intent to prejudice the defendant, and that it also acted without culpable negligence, which we have defined as "less than gross negligence but more than ordinary negligence." If the State carries its burden, to claim relief the defendant must "demonstrate[ ] that the lost evidence was material, to the degree that its introduction would probably have led to a verdict of not guilty, and that its loss prejudiced [the defendant] by precluding the introduction of evidence that would probably have led to a verdict in his favor.

*State v. Smagula*, 133 N.H. 600, 578 A.2d 1215, 1217 (1990) (citations omitted).

> New Mexico has adopted a three-part test to determine whether deprivation of evidence violates a criminal defendant's right to due process and requires suppression of the evidence. With regard to each item of evidence, the district court must determine whether:

1) The State either breached some duty or intentionally deprived the defendant of evidence;

2) The improperly "suppressed" evidence [was] material; and

3) The suppression of [the] evidence prejudiced the defendant.

*State v. Hill,* 138 N.M. 693, 125 P.3d 1175, 1180 (Ct.App.2005) (citing *State v. Chouinard,* 96 N.M. 658, 634 P.2d 680, 683 (1981)); *accord State v. Ware,* 118 N.M. 319, 881 P.2d 679, 682–83 (1994).

One commentator concludes that the "Delaware/Tennessee" approach represents that best means to uphold a defendant's right to a fundamentally fair trial without placing an inordinate burden on the State.

[T]he balancing approach adopted by Delaware, Tennessee, and others is clearly the better approach. The balancing approach is the better approach because a fundamentally unfair trial is less likely to occur under that approach than under the *Youngblood* bad faith test. Further, under the balancing approach, courts have more flexibility in upholding and reversing convictions when the interests of justice require that it [sic] do so. That flexibility is missing from the *Youngblood* approach. Finally, the balancing approach—a more "effective way[ ] of protecting the rights of the individual while promoting efficient enforcement of our criminal laws"—is superior because it is more fair to defendants, but not less fair to the State, than the *Youngblood* approach, and it is just as easy to apply. Under the balancing approach, more so than under *Youngblood,* a court is permitted [to] engage in "a search for truth, not an adversary game." For this reason alone, the balancing approach is the superior approach.

Dinger, *supra,* 27 AM. J.CRIM. L. at 383 (quoting *Miranda v. Arizona,* 384 U.S. 436, 467, 86 S.Ct. 1602, 1624, 16 L.Ed.2d 694 (1966); *United States v. Perry,* 471 F.2d 1057, 1063 (D.C.Cir.1972)). We agree with this analysis and adopt the Delaware/Tennessee approach, stated above, as the standard for claims arising under article I, section 19 of the Texas Constitution. *See Deberry,* 457 A.2d at 750–52; *see also Gurley,* 639 So.2d at 566–67; *Ferguson,* 2 S.W.3d at 917; *Delisle,* 648 A.2d at 642–43; *Osakalumi,* 461 S.E.2d at 511–12.

## G. Application

### 1. Was Evidence Subject to Discovery or Disclosure?

 "[A] criminal defendant has a right to inspect evidence indispensable to the State's case because that evidence is necessarily material to the defense of the accused." *McBride v. State,* 838 S.W.2d 248, 251 (Tex.Crim.App.1992); *accord Nowling v. State,* 801 S.W.2d 182, 185 (Tex.App.-Houston [14th Dist.] 1990, pet. ref'd); *see also* TEX.CODE CRIM. PROC. ANN. art. 39.14(a) (Vernon Supp.2006) (defendant has right to discovery of "tangible things not privileged, which constitute or contain evidence material to any matter involved in the action and which are in the possession, custody or control of the State or any of its agencies"). In a marihuana case, the alleged marihuana is necessarily "indispensable to the State's case," and the defendant has "a right to inspect that evidence." *See McBride,* 838 S.W.2d at 251; *Nowling,* 801 S.W.2d at 185.

### 2. Did the State Have a Duty to Preserve?

██ The plant material which was destroyed in Pena's case was material evidence. *Id.* Yet because it was not independently tested, the evidence was merely potentially useful. Nothing more may be

said of the missing plant material than that it could have been subjected to an independent test. *See Illinois v. Fisher,* 540 U.S. 544, 547, 124 S.Ct. 1200, 1202, 157 L.Ed.2d 1060 (2004) (unpreserved evidence was potentially useful because the defense could have subjected it to a fifth test). Also, given the material's complete destruction, it is clear that Pena was unable to obtain comparable evidence by other reasonably available means. *See Trombetta,* 467 U.S. at 489, 104 S.Ct. at 2534. Finally, it seems logical to impose a duty of preservation where the evidence in question is "indispensable to the State's case" and the defendant has "a right to inspect that evidence." *See McBride,* 838 S.W.2d at 251; *Nowling,* 801 S.W.2d at 185. Therefore, the State had a duty to preserve the plant material, and because it was not preserved, the State has breached this duty.

### 3. What Consequences Should Flow from this Breach?

#### (a) Degree of Negligence

■ We now turn to the consequences of this breach. It is evident from the record that the plant material was not destroyed with the intent to deprive Pena of access to it. The destroyed plant material and accompanying missing files were most likely the result of two acts of negligence. Mott testified that the files were most likely lost during the lab's relocation and that the plant material was destroyed because a destruction order was received.

#### (b) Importance of Lost Evidence

Because the plant material was the sole basis for Pena's arrest and prosecution, it was of paramount importance and became more so after the files documenting its testing were lost. Consequently, the lab report, exclusively relied upon at trial, is the only evidence recording that the de-

stroyed plant material was tested, and it stands unsupported by documentation and unverified by human memory.

#### (c) Sufficiency of Other Evidence

Regarding the third factor, the sufficiency of the other evidence, the photographic evidence of the plant material and Asby's testimony would support a finding that Pena possessed marihuana on the occasion in question. *See Ward v. State,* 659 S.W.2d 643, 644–45 (Tex.Crim.App.1983) (finding that despite no chemical analysis, officer's testimony that leafy substance was marihuana was sufficient). However, *Ward* is a case in which the defendant was charged with possessing the smallest prosecutable quantity of marihuana, less than two ounces. *See id.* at 643. Thus, it was not important in that case to have evidence regarding the quantity of the marihuana the defendant was found to be in possession of. Conversely, even assuming the material seized from Pena's van was marihuana, evidence of quantity is important to determine whether he should be punished for the commission of a state jail felony or a third degree felony. *See* TEX. HEALTH & SAFETY CODE ANN. § 481.121(b)(3), (4) (Vernon 2003). Photographs and officer testimony are far less probative on this element of the State's case.

#### 4. Summary

Pena had a right to inspect the plant material and it was subject to discovery. The State had a duty to preserve this evidence, which the State breached. Regarding the consequences which should flow from this breach, the State's negligence was arguably slight. However, the other factors, the importance of the lost evidence and the sufficiency of the remaining evidence, weigh heavily in Pena's favor. Therefore, we hold that Pena was denied due course of law by the State's destruc-

tion of the plant material and the DPS lab file documenting its testing and subsequent destruction.

## H. Harm

■ Having found a constitutional violation, we must next determine whether this error requires reversal. Under Rule of Appellate Procedure 44.2(a), such an error requires reversal "unless the court determines beyond a reasonable doubt that the error did not contribute to the conviction or punishment." TEX.R.APP. P. 44.2(a); *see Pope v. State,* 161 S.W.3d 114, 121 (Tex.App.-Fort Worth 2004), *aff'd,* 207 S.W.3d 352 (Tex.Crim.App.2006); *Moore v. State,* 143 S.W.3d 305, 323 (Tex.App.-Waco 2004, pet. ref'd); *Fox v. State,* 115 S.W.3d 550, 563 (Tex.App.-Houston [14th Dist.] 2002, pet. ref'd).

Here, the error impacted the determination of Pena's guilt because it affected his ability to prove his contention that the plant material was something other than marihuana or that it amounted to a quantity less than charged in the indictment. *Cf. Nowling,* 801 S.W.2d at 184–85. Therefore, we cannot say beyond a reasonable doubt that the error did not affect Pena's conviction or punishment.

## I. Appropriate Remedy

■ There are generally three recognized remedies for the loss or destruction of evidence: (1) dismissal; (2) exclusion of related evidence; or (3) an adverse inference instruction.

A dismissal for this type of error is generally disfavored. *See Fain,* 774 P.2d at 266. The Court of Criminal Appeals of Alabama suggests that dismissal is an appropriate sanction only if the State acted in bad faith when it destroyed the evidence at issue. *Gurley,* 639 So.2d at 569. In New Mexico, "[d]ismissal is not a proper remedy without a showing that the defendant 'will be deprived of a fair trial if ... tried without the missing evidence.'" *Hill,* 125 P.3d at 1181 (quoting *State v. Bartlett,* 109 N.M. 679, 789 P.2d 627, 629 (Ct.App.1990)). The Supreme Judicial Court of Massachusetts has similarly held that dismissal may be an appropriate remedy, even when the state does not act in bad faith, if the loss or destruction of the potentially exculpatory evidence "is nonetheless so critical to the defense as to make a criminal trial fundamentally unfair." *Commonwealth v. Henderson,* 411 Mass. 309, 582 N.E.2d 496, 497 (1991) (quoting *Youngblood,* 488 U.S. at 61, 109 S.Ct. at 339 (Stevens, J., concurring)).

Another potential remedy is the exclusion of evidence related to the lost or destroyed evidence. *See Gurley,* 639 So.2d at 569; *Commonwealth v. Willie,* 400 Mass. 427, 510 N.E.2d 258, 263 (1987); *Chouinard,* 634 P.2d at 684. In Pena's case, this would entail the exclusion of Mott's testimony and the lab report, which would present a substantial hurdle to Pena's prosecution on retrial.

Finally, most courts authorize the use of an adverse inference instruction as the appropriate remedy. *See Gurley,* 639 So.2d at 569; *Thorne,* 774 P.2d at 1331; *Lolly,* 611 A.2d at 961–62 & n. 6; *Fain,* 774 P.2d at 266; *Willie,* 510 N.E.2d at 263; *Chouinard,* 634 P.2d at 684; *Ferguson,* 2 S.W.3d at 917 & n. 11; *State v. Paynter,* 206 W.Va. 521, 526 S.E.2d 43, 52 (1999).

■ Under the circumstances of this case, we hold that an adverse inference instruction is the appropriate remedy.[26]

---

26. There may be cases in which the exclusion of evidence is an appropriate remedy, but not in a case like Pena's in which exclusion of the evidence would be tantamount to an acquittal.

We provide two examples for the trial court to consider as it crafts an appropriate instruction for Pena's case.

The Supreme Court of Idaho recommended the following instruction in a case in which a pathologist discarded swabs containing fluid samples from the victim's body after testing them.

> You may take note of the fact that the state had obtained bodily fluid samples from the body of the victim, that such samples are, as a matter of law, material evidence in that scientific tests are available which may exclude an individual from that class of persons who could have committed the crime, that the state lost or destroyed the samples, and that the defendant therefore did not have an opportunity to conduct such tests. The fact that the state lost or destroyed the samples does not, in itself, require that you acquit the defendant. It is, however, one factor for you to consider in your deliberations.

*Fain*, 774 P.2d at 266.

By contrast, the Supreme Court of Tennessee endorsed the following instruction in a case in which the police inadvertently recorded over a videotape depicting a defendant performing field sobriety tests.

> The State has a duty to gather, preserve, and produce at trial evidence which may possess exculpatory value. Such evidence must be of a nature that the defendant would be unable to obtain comparable evidence through reasonably available means. The State has no duty to gather or indefinitely preserve evidence considered by a qualified person to have no exculpatory value, so that an as yet unknown defendant may later examine the evidence.

> If, after considering all of the proof, you find that the State failed to gather or preserve evidence, the contents or qualities of which are in issue and the production of which would more probably than not be of benefit to the defendant, you may infer that the absent evidence would be favorable to the defendant.

*Ferguson*, 2 S.W.3d at 917 n. 11.

We do not endorse either of these as the appropriate instruction for Pena's case. Rather, we offer them for the assistance of the trial court in this emerging area of law in the event of a retrial.

## IV. Conclusion

The admission of Mott's testimony and the DPS lab report without an accompanying instruction violated Pena's right to due course of law under article I, section 19 of the Texas Constitution. Therefore, we sustain Pena's first issue and do not reach his remaining issues.

We reverse the judgment and remand this cause to the trial court for further proceedings consistent with this opinion.

Chief Justice GRAY dissenting [27].

27. In reading the dissenting opinion's selection from the Scriptures, we are reminded of the recent observation of the Court of Criminal Appeals:

> First, the statement is unnecessary; it contributes nothing to the legal issue before us. Second, and most importantly, it is highly unprofessional. When a judge chastises other members of the judiciary in this manner, it not only reflects poorly on the judge, it undermines the integrity of the justice system. The words of Supreme Court Justice Kennedy are particularly appropriate here:

> > The collegiality of the judiciary can be destroyed if we adopt the habits and mannerisms of modern, fractious discourse. Neither in public nor in private must we show disrespect for our fellow judges. Whatever our failings, we embody the law and its authority. Disrespect for the person leads to disrespect for the cause. If public respect for the judiciary is to be maintained, it must begin from within.

Chief Justice GRAY, dissenting.

"As a dog returns to its vomit, so a fool repeats his folly." *Proverbs* 26:11. As the majority did in 2005, *see Pena v. State,* 166 S.W.3d 274 (Tex.App.-Waco 2005) (*"Pena I"*), *vacated,* 191 S.W.3d 133 (Tex.Crim. App.2006), the majority again reverses Pena's conviction, and holds that the trial court erred in overruling Pena's objections to the testimony of Texas Department of Public Safety criminologist Charles Mott and related evidence without giving a jury instruction unknown to Texas law, *see Pena v. State,* 226 S.W.3d 634 (Tex.App.-Waco 2007, no pet. h.) (op. on remand) (*"Pena II"*). We ordered rebriefing in Pena's case, as the Texas Court of Criminal Appeals directed in vacating and remanding the majority's earlier judgment. *See Pena,* 191 S.W.3d at 138; *Pena v. State,* 192 S.W.3d 684 (Tex.App.-Waco 2006, order) (per curiam), *disp. on merits, Pena II,* 226 S.W.3d 634. Pena's brief on remand adds nothing, but merely regurgitates the majority's analysis in *Pena* I. The majority's opinion conflicts with the applicable decisions of the Court of Criminal Appeals, the Texas Supreme Court, and the other courts of appeals. The majority again seeks improperly and unjustifiably to "extend" the law. *See In re B.L.D.,* 56 S.W.3d 203, 211 (Tex.App.-Waco 2001), *rev'd,* 113 S.W.3d 340 (Tex.2003) (termination of parent-child relationship); *In re A.V.,* 57 S.W.3d 51, 57 (Tex.App.-Waco 2001), *rev'd,* 113 S.W.3d 355 (Tex. 2003) (termination of parent-child relationship). I dissent.

The majority's opinion glosses over two properly dispositive parts of the analysis, namely preservation of error and harm, in less than a page each, in order to publish its thirty-six page, mediocre law-review article on the merits of Pena's issues under the Texas Constitution. We should instead decide the case on one of those two proper bases, since "[i]f there is one doctrine more deeply rooted than any other in the process of constitutional adjudication, it is that we ought not to pass on questions of constitutionality ... unless such adjudication is unavoidable." *Pena,* 191 S.W.3d at 136 (quoting *Clinton v. Jones,* 520 U.S. 681, 690, 117 S.Ct. 1636, 137 L.Ed.2d 945 (1997)). Even if the majority's analysis of the merits were correct, Pena's failure to preserve his complaint is fatal to his issue; and the majority's harm analysis is utterly insufficient, while a proper harm analysis would probably find that any error was harmless.

## I. PRESERVATION OF ERROR

The majority's analysis of the preservation of error is as follows, in its entirety:

The State argues that Pena has not preserved this aspect of his first issue for appellate review because he did not argue in the trial court that the Texas Constitution provides greater rights than the federal constitution. We disagree. Pena argued to the court that his rights under the Due Course of Law provision of the Texas Constitution were violated by the admission of this evidence. If, as the State contends, the federal and state provisions are synonymous, then Pena's objection under the Texas Constitution was meaningless.

Pena specifically objected to the trial court that the admission of Mott's testimony and the lab report would violate his right to due course of law under article I, section 19 of the Texas Constitution because the State had destroyed the seized plant material. This was sufficient to preserve this issue for appel-

*Ex parte Olivares,* 202 S.W.3d 771, 773 (Tex. Crim.App.2006) (quoting Anthony M. Kenne-

dy, *Judicial Ethics and the Rule of Law,* 40 St. Louis U. L.J. 1067, 1072 (1996)).

late review. *See Sax v. Votteler*, 648 S.W.2d 661, 664 (Tex.1983) (rejecting court of appeal's holding that "open courts" complaint was not preserved by plaintiff's objection that statute violated the "due process provisions of the United States and Texas Constitutions"); *cf. Heidelberg v. State*, 144 S.W.3d 535, 542–43 (Tex.Crim.App.2004) (holding state constitutional issue not preserved because of, among other things, "counsel's failure to cite to the state constitution").

[sic] *Pena* II, at 637–38 (majority op.). The majority, in preference to the recent cases of the Court of Criminal Appeals to the effect that general objections do not preserve error, cites a twenty-five-year-old Texas Supreme Court case. *See id.*, at 637 (citing *Sax*, 648 S.W.2d at 664); *but compare*, recently, *Hyundai Motor Co. v. Vasquez*, 189 S.W.3d 743, 759–60 (Tex.2006) (error not preserved); *In re K.A.F.*, 160 S.W.3d 923, 928 (Tex.2005) (termination of parent-child relationship) (constitutional error not preserved).

Pena argues that he "preserved for appellate review his contention that the Due Course of Law Clause of Article I, Section 19 of the Texas Constitution provides defendants with a greater level of protection with regard to lost or destroyed evidence than does the Due Process Clause of the Fourteenth Amendment." (Br. at 4 (citing U.S. CONST. amend. XIV; TEX. CONST. art. I, § 19).) It is undeniable that Pena did not apprise the trial court that Pena believed that the Texas Constitution's protections differed in any way from the United States Constitution's. From the record, it is manifest that no person, neither the trial court, the State's attorneys, nor Pena himself, understood Pena to make such an argument.

"As a prerequisite to presenting a complaint for appellate review, the record must show that … the complaint was made to the trial court by a timely request, objection, or motion that … stated the grounds for the ruling that the complaining party sought from the trial court with sufficient specificity to make the trial court aware of the complaint, unless the specific grounds were apparent from the context…." TEX.R.APP. P. 33.1(a); *see Griggs v. State*, 213 S.W.3d 923, 927 (Tex.Crim.App.2007) (reversing this Court); *Buchanan v. State*, 207 S.W.3d 772, 775 (Tex.Crim.App.2006); *Keeter v. State*, 175 S.W.3d 756, 759–61 (Tex.Crim.App.) (reversing this Court), *cert. denied*, 546 U.S. 852, 126 S.Ct. 114, 163 L.Ed.2d 124 (2005); *Loredo v. State*, 159 S.W.3d 920, 923–24 (Tex.Crim.App.2004) (reversing this Court); *Sanchez v. State*, 120 S.W.3d 359, 364–65 (Tex.Crim.App.2003); *Hailey v. State*, 87 S.W.3d 118, 121–22 (Tex.Crim.App.2002) (reversing this Court). "[I]n order to preserve an issue for appeal, a timely objection must be made that states the specific ground for objection, if the specific ground was not apparent from the context." *Buchanan* at 775 (citing *Heidelberg*, 144 S.W.3d at 537). "Generally speaking, a party's complaint is adequately specific if the party lets the trial judge know what he wants and why he is entitled to it, and a party's complaint is timely if the party makes the complaint as soon as the grounds for it become apparent." *Gillenwaters v. State*, 205 S.W.3d 534, 537 (Tex.Crim.App.2006) (citing *Lankston v. State*, 827 S.W.2d 907, 909 (Tex.Crim.App.1992); *Hollins v. State*, 805 S.W.2d 475, 476 (Tex.Crim.App.1991)).

"Preservation of error is not merely a technical procedural matter by which appellate courts seek to overrule points of error in a cursory manner. Fairness to all parties requires a party to advance his complaints at a time when there is an opportunity to respond or cure them."

*Loredo,* 159 S.W.3d at 923. "There are two main purposes behind requiring a timely, specific objection: 1) to inform the judge of the basis of the objection and give him the chance to make a ruling on it, and 2) to give opposing counsel the chance to remove the objection or provide other testimony." *Garza v. State,* 126 S.W.3d 79, 82 (Tex.Crim.App.2004) (citing *Zillender v. State,* 557 S.W.2d 515, 517 (Tex.Crim.App. 1977)). "A general or imprecise objection may be sufficient to preserve error for appeal, but only if the legal basis for the objection is *obvious* to the court and to opposing counsel." *Buchanan,* 207 S.W.3d at 775 (citing *Heidelberg,* 144 S.W.3d at 539–43) (emphasis in *Buchanan* ). "When the objection is not specific, and the legal basis is *not* obvious, it does not serve the purpose of the contemporaneous-objection rule for an appellate court to reach the merits of a forfeitable issue that is essentially raised for the first time on appeal." *Id.* (citing *Aldrich v. State,* 104 S.W.3d 890, 894 (Tex.Crim.App.2003)) (emphasis in *Buchanan* ).

"Whichever party complains on appeal about the trial judge's action must, at the earliest opportunity, have done everything necessary to bring to the judge's attention the evidence rule in question and its precise and proper application to the evidence in question." *Reyna v. State,* 168 S.W.3d 173, 177 (Tex.Crim.App.2005) (quoting 1 STEPHEN GOODE ET AL., TEXAS PRACTICE: GUIDE TO THE TEXAS RULES OF EVIDENCE; CIVIL AND CRIMINAL § 103.2 (2d ed.1993) (emphasis omitted in *Reyna* )). "[I]t is not enough to tell the judge that evidence is admissible" or inadmissible. *Reyna* at 177. The appellant "must have told the judge why the evidence was admissible" or inadmissible in order to preserve a complaint for appeal.[1] *Id.* A complaint that thus fails to apprise the trial court of the claim procedurally defaults the claim. *Sanchez,* 120 S.W.3d at 364–65; *Wilson v. State,* 7 S.W.3d 136, 145 (Tex.Crim.App. 1999); *Dixon v. State,* 928 S.W.2d 564, 565 (Tex.Crim.App.1996) (per curiam).

What may arguable constitute preservation of Pena's issues is as follows.

Pena contends that "[i]nitially Pena's counsel, in a pretrial motion, sought to suppress physical evidence the State intended to offer at trial as a violation of Federal and State Constitutions." (Br. [on remand] at 4.) Pena does not cite to the record. The only such motion I see in the record is part of Pena's Omnibus Pretrial Motions:

> The Defendant requests a hearing outside the jury's presence to determine the admissibility of any physical evidence recovered during the investigation of this case and which the District Attorney intends to offer as evidence herein, and would request that the Court suppress this evidence if the Court determines that the evidence was obtained in violation of the United States Constitution or the Texas Constitution.

(I C.R. at 94.) That motion—if it is an objection—would not preserve Pena's com-

---

1. "When attempting to make new law, counsel should object and clearly explain their reasoning. Specifically, counsel should assert that although what the trial court is doing is correct under the current law, it would be incorrect under the law as it should be fashioned." Polly Jessica Estes, *Preservation of Error: From Filing the Lawsuit Through Presentation of Evidence,* 30 ST. MARY'S L.J. 997, 1070 (1999); *see* Brent G. Filbert, Annotation, *Failure of Police to Preserve Exculpatory Evidence as Violating Criminal Defendant's Rights under State Constitution,* 40 A.L.R. 5TH 113, § 2[b], at 121 (1996). "To generalize is to omit ... [.]" Estes at 1066 (quoting *Donnell v. Herring–Hall–Marvin Safe Co.,* 208 U.S. 267, 273, 28 S.Ct. 288, 52 L.Ed. 481 (1908)) (ellipsis in Estes).

plaint for appellate review.[2]

The court heard Pena's pretrial motions "in chambers," and the appellate record does not contain a reporter's record of the hearing. (*See* 3 R.R. at 3.)

In a pretrial hearing on the record, the trial court ruled on the motion as follows, in colloquy with Pena's attorney, Brent J. Cahill.

THE COURT: The defendant requests a hearing outside the jury's presence to determine the admissibility of any physical evidence recovered during the investigation. Well, if you're—I don't know what evidence you're talking about here. If you're talking about physical evidence, as I understand it, it has been misplaced or lost.

MR. CAHILL: Judge, to my knowledge the only evidence that existed in the case was the alleged marijuana which the State does not have, and I don't know that there is anything else but—

THE COURT: So that is denied then.

MR. CAHILL: There could be.

(3 R.R. at 6.)

Later in the same pretrial hearing, Pena continued, in colloquy with the District Attorney, Ray Montgomery:

MR. CAHILL: We do need to address the motion to suppress and get on the record what the Court is going to do with that. The objections in the—I would add to those objections Section 481.160 of the Health and Safety Code dealing with destruction of evidence wherein under the new law in this section that was enacted that the State is required to keep five samples, five representative samples to be made available to defense for purposes of discovery. And that along with the constitutional objections and custody objections under the laws of the State of Texas and Constitution of the United States and the State of Texas I would add into that motion that under 38.22 of the Code of Criminal Procedure that nothing that arose out of that evidence that was taken by the State and destroyed by the State and tested by the State should be admissible in this proceeding.

THE COURT: Okay. And I would note that under the case law, as I understand it, it is the burden of proof of the defendant to prove that the destruction of the evidence was done willfully and that—and it is further your burden to show that the retention of the evidence would be favorable to your case. So, therefore, the Court is going to carry that motion along with the trial of this case. But that is your burden, your burden of proof as I understand the law. Does anybody have any comment they would like to make on that?

MR. MONTGOMERY: That's our understanding as well, Judge.

MR. CAHILL: Judge, I do because additionally we have—and I will add to the motion the confrontation issue under the Sixth Amendment and Fourteenth Amendment of the United States Constitution and Article One, Section 9 of the Texas Constitution, that offends the confrontation clause. And in the case that the State relies on I would distinguish that for the Court in that that was a— and the cite is in my file. I would be

---

**2.** It may be only a motion in limine, which, of course, does not preserve error for appellate review. *See Manns v. State,* 122 S.W.3d 171, 190 (Tex.Crim.App.2003); *Geuder v. State,* 115 S.W.3d 11, 14–15 (Tex.Crim.App.2003); *Martinez v. State,* 98 S.W.3d 189, 193 (Tex. Crim.App.2003); *Norman v. State,* 523 S.W.2d 669, 671 (Tex.Crim.App.1975) (plurality op.); *Brazzell v. State,* 481 S.W.2d 130, 131 (Tex.Crim.App.1972); *Thomas v. State,* 477 S.W.2d 881, 884 (Tex.Crim.App.1972)

glad to provide that to the Court. The Court has been provided a copy of that case to my understanding. That case was about the destruction of blood evidence that was procured by a hospital, not a representative of the State of Texas or an arm of the State of Texas. It was not gathered in preparation for litigation such as this was. It was not examined and tested in preparation for litigation such as in the case at hand here. And the person that got up and testified about it was an independent lab technician from an independent lab that had no contact with law enforcement, either in preparation for trial or in an adversarial process. And, therefore, the Court ruled that that person could testify and that that report could come in and that that destruction was not then because of anything that the State did. That any of that comes in.

In this case the alleged marijuana was taken by the State, it was tested by the State. It was done in an adversarial proceeding and in anticipation of an adversarial position of the parties in preparation for litigation. And then it was lost or destroyed or something happened to it by the State in direct contravention of the Rules that they keep the evidence.....

. . . .

THE COURT: I need to hear the evidence before I rule on this. But citing these cases, the United States versus *Valenzuela, Bernaul* and the Mahaffey case, a showing that the lost evidence might have been favorable does not have the—does not meet the materiality standard. And then California versus *Trombarro*, again Mahaffey. When an accused complains of

lost evidence he must show that the evidence lost is both material and favorable to him. .... We are going to carry this notion along with the case. . . .

[sic] (3 R.R. at 9–12) (ellipses added); *see* U.S. CONST. amends. VI, XIV; *California v. Trombetta*, 467 U.S. 479, 104 S.Ct. 2528, 81 L.Ed.2d 413 (1984); *United States v. Valenzuela–Bernal*, 458 U.S. 858, 102 S.Ct. 3440, 73 L.Ed.2d 1193 (1982); TEX. CONST. art. I, § 9; TEX.CODE CRIM. PROC. ANN. art. 38.22 (Vernon 2005); TEX. HEALTH & SAFETY CODE ANN. § 481.160 (Vernon Supp.2006); *Mahaffey v. State*, 937 S.W.2d 51 (Tex. App.-Houston [1st Dist.] 1996, no pet.); *e.g., Durrett v. State*, 36 S.W.3d 205 (Tex. App.-Houston [14th Dist.] 2001, no pet.).[3]

During trial, outside the presence of the jury, Pena objected as follows, in colloquy with an assistant district attorney, Whitney P. Smith:

MR. CAHILL: The other issue that we have before we bring the[ ] in is whether or not the results of anything that he tested based on the fact—and I will object under the Sixth Amendment of the United States Constitution and Article One, Section Nine of the Constitution of the State of Texas, under the right of confrontation that there is no way that I can adequately cross examine and confront this expert on alleged marijuana that no longer exists.

Additionally, the objection would be under the due process of rights of the accused and due course of law, which would be the Fifth and Sixth and Fourteenth Amendments.

THE COURT: Are you saying that the right of confrontation under the

---

**3.** By "custody objections," I understand Pena to mean objections to the chain of custody. *See Lagrone v. State*, 942 S.W.2d 602, 617 (Tex.Crim.App.1997); *Stoker v. State*, 788 S.W.2d 1, 10 (Tex.Crim.App.1989). I see no such objections in the record.

Constitution would apply to an object such as marijuana?

MR. CAHILL: Yes, Judge, I am. Because there is no way that I can adequately across—

THE COURT: Let me see your case on that.

MR. CAHILL: Judge, I don't have a specific case on the actual issue.

THE COURT: The Court has always been under the opinion that right of confrontation applies to witnesses against a person.

MR. CAHILL: That's correct, Your Honor.

THE COURT: And not an object.

MR. CAHILL: The problem here, Your Honor, if I could address it, is this witness is going to testify about an object.

THE COURT: Okay.

MR. CAHILL: That object is no longer in existence because of, we believe, this witness, which would like to get into next. And so that in itself does not allow me to adequately confront and cross examine him because I could never see what he's talking about, touch what he's talking about, have an independent lab test what he is talking about. He might as well say the gun that murdered the fellow, I looked at the gun, I saw it, I got fingerprints and, well, I don't have any of that stuff but I will tell you all about it now.

THE COURT: I don't believe right of confrontation reaches that far and you're overruled on that point.

MR. CAHILL: I would address the due process rights of the accused and due course of law, additionally, Judge. But if you're going to allow that in and allow—

THE COURT: I don't know what I'm going to allow in. I don't know what

they are going to ask him to get in here. I guess you're going to have the results of a lab report?

MR. SMITH: That's right, Your Honor.

THE COURT: Is that all we are going to have?

MR. SMITH: That's right, Your Honor. And we would like to also—

THE COURT: Get it out, get it marked so we know what we are talking about here.

MR. SMITH: Yes, sir.

[sic] (3 R.R. at 95–98) (bracketed alteration added); *see* U.S. CONST. amends. V–VI, XIV; TEX. CONST. art. I, § 9. The exhibit marked was Mott's lab report.

After the State examined Mott on the testing of Pena's marihuana and Mott's report thereof, Pena stated:

MR. CAHILL: Judge, I don't have anything. I would re-urge my objection. If the Court would like to allow me the opportunity to put it clearly on the record because—or make a decision whether this is going to come in when they don't have any dope for to us test.

THE COURT: All right. Now, the Court understands that we have lost evidence here and in these type cases the defendant must show that the prosecution acted in bad faith when it failed to preserve the evidence to show violation of due process or due course of law. And the defendant also has to prove that the lost evidence would be material to the case. And there is no question here it would be material to the case. It is the essence of the case. And that the evidence would be favorable to the defendant. So I guess that's my duty to rule on those kind of questions.....

[sic] (3 R.R. at 113–14) (ellipsis added).

After further examination and cross-examination of Mott, the trial court found:

Then the Court is—the Court finds then that the evidence that was lost is material but the Courts fails to find how it could be favorable to the defendant if it had been brought here into Court. And also the Court does not find that there was any bad faith on the part of the State or wilful misconduct on the part of the State in losing this evidence insofar as this witness is concerned.....

[sic] (3 R.R. at 124–25.)

After further colloquy on the source of authority to destroy the marihuana, Pena continued, and the trial court ruled:

MR. CAHILL: And I would again just—if I understand the Court going to let this testimony in, that this was tested as marijuana, that it was marijuana and the weight of the marijuana, and when the Court found that it wasn't done purposefully by the laboratory, be it the State of Texas, that puts defense counsel in a posture, Judge, where we are forced to assume the burden and prove a negative.

THE COURT: I know that, Mr. Cahill. But you know, I didn't write the law.

MR. CAHILL: I understand that, Judge.

THE COURT: I'm just trying to follow the law and that's what these cases say. I realize it puts the defendant in a predicament. And you're doing just what I would do if I was in your shoes. But I didn't write the law. I have got to follow the law that the courts write for me and that's what I'm trying to do and that's what they told me to do so I'm doing it.

MR. CAHILL: I think that, Judge, when there is other evidence or substantial evidence that an offense was committed—and I think that is why we don't see it in the law because this just insults justice so much, Judge.

THE COURT: Right, I understand. That really goes to the jury, though, more than to me because I took an oath to follow this law and I'm going to follow it. If you have got a case that says I'm wrong let me have it and I will follow that case.

MR. CAHILL: I would have made you ten copies already, Judge, if I did.

THE COURT: Okay.

MR. CAHILL: For the purposes of this. And when we bring back the jury, Judge, I would like at this time to be allowed to re-urge my previous objection, make sure it's clear. And when the jury comes in if I can just say, Judge, I re-urge or something to protect the appellate record.

THE COURT: Right. I want you to protect the appellate record.

MR. CAHILL: I think we know where it's going.

THE COURT: Whatever we need to do in that regard let's do it.

MR. CAHILL: I would re-urge everything as set out in the motion to suppress. Along with that I would re-urge under Section 481.10 or 160 of the Health and Safety Code, Texas Controlled Substance Act. I would also re-urge—it's not in the motion, along with that under 38.22 that anything that came out of this after it has been destroyed be suppressed, Judge.

The confrontation clause, I think, is a big issue here from the defense standpoint. So I would object under the Sixth and Fourteenth Amendments of the U.S. Constitution and Article One, Section Nine of the Texas Constitution under due process. Article One, Section Nineteen of the Texas Constitution and the Fifth and Fourteenth Amendments to the U.S. Constitution under the rights of the accused, and Article One, Section

Ten of the Texas Constitution and the Sixth Amendment of the U.S. Constitution.

I would object under due course of law and object under 1.04, 1.051 and 1.06 of the Code of Criminal Procedure. If the Court is going to allow—those would address the issue of this nonexistent evidence being presented.....

....

... Those are my objections to that. And the only one I would add would be that I might ask the trial court, since he is coming in as an expert testifying about—although until he says he actually did something that now no longer exists under 705(a) and (d), I believe, under 705 of the Rules of Evidence. I would like the Court to take into consideration that and do a balancing test and put it on the record and give the jury a limiting instruction that's it's not to be used for any purpose other than to say well, at one time it may have existed but not for the facts asserted on the underlying test that we cannot—we can't cross him on, Judge.

THE COURT: I wouldn't know how to do what you're asking me to do.

MR. CAHILL: All right. That's all I have on the issue of the nonexistent evidence.

THE COURT: Then you have clearly stated your objection and the Court has heard them and you have stated them well. However, the Court overrules those objections.....

[sic] (3 R.R. at 126–30) (ellipses added); *see* U.S. Const. amends. V–VI, XIV; Tex. Const. art. I, §§ 9–10, 19; Tex.Code Crim. Proc. Ann. arts. 1.04, 1.051, 1.06 (Vernon

2005), art. 38.22; Tex. Health & Safety Code Ann. § 481.160; Tex.R. Evid. 705.

Before the jury, Pena objected:

Judge, of course my previous objection that was urged prior to this I just re-urge it again now and that I urged at the beginning of the testimony.

(3 R.R. at 146.) The trial court admitted Mott's report.

Although Pena used the words "due course of law" and cited Texas Constitution Article I, Section 19—although not in proximity to each other—nowhere does Pena apprise the trial court that due course of law under the Texas Constitution had any different bearing on his case than did due process of law under the United States Constitution. Pena frankly acknowledged to the trial court that he had no case authority for the propositions that Pena was advocating.[4] To say that an appellant must have presented authority for arguments "is not to say that [an] appellant may not make a novel argument for which there is no authority directly on point. However, in making such an argument, [an] appellant must ground his contention in analogous case law or provide the [c]ourt with the relevant jurisprudential framework for evaluating his claim." *Tong v. State,* 25 S.W.3d 707, 710 (Tex. Crim.App.2000) (op. on orig. submission). Pena did not do so; he did nothing more than recite the words "due course of law." In holding that Pena preserved a complaint, the majority's decision conflicts with the applicable decisions of the Court of Criminal Appeals.

In holding that Pena preserved his complaint, the majority, as it did in *Loredo v. Texas,* "ignore[s] a fundamental principle of error preservation: that the trial court must be made aware of a complaint at a

---

4. Indeed, Pena argues that the trial court was "unauthorized to independently interpret state constitutional provisions." (Br. [on remand] at 3.)

time and in a manner so that it can be corrected." *See Loredo,* 159 S.W.3d at 923. A party complaining of error bears a "burden to draw the trial court's attention to the error so that the trial court may have the opportunity to make an error free ruling." *Id.* at 924. A corollary of that principle is that the complaining party must correct erroneous statements on which the trial court's ruling is based. In *Loredo,* the "Court of Appeals" (the same majority as here) "disregarded the fact that the trial court's ruling was based ... on the judge's erroneous recollection, which was stated on the record explicitly for the parties to correct, if necessary." *Id.* at 923. Where "the defendant fail[s] to correct the trial court's erroneous statement," the defendant "therefore fail[s] to meet his burden to show the trial court that his" objection "should have been" sustained. *Id.* at 924. As in *Loredo,* where the "appellant failed to dispute the court's recollection even when invited to do so," here Pena failed to dispute the trial court's statement of the law, which Pena now contends was erroneous, even when the trial court expressly invited Pena to do so at least three times.[5] Thus, as in *Loredo,* Pena's "silence resulted in his failure to inform the trial court of his complaint at a time and in a manner that it could be corrected, in violation of the basic requirements of Texas Rule of Appellate Procedure 33.1." *See id.*

Moreover, " 'shotgun' objections, citing many grounds for the objection without argument, will not preserve points based on authority which is merely mentioned in the trial court." *Webb v. State,* 899 S.W.2d 814, 817 (Tex.App.-Waco 1995, pet. ref'd); *accord Holmes v. State,* 135 S.W.3d 178, 185 (Tex.App.-Waco 2004, no pet.); *McCullough v. State,* No. 05–97–00950–CR, 1999 WL 31204, at *3, 1999 Tex.App. LEXIS 419, at *7 (Tex.App.-Dallas Jan. 27, 1999, no pet.) (not designated for publication); *Ex parte Sullivan,* No. 05–98–00016–CR, 1998 WL 205860, at *1, 1998 Tex.App. LEXIS 2042, at *3 (Tex.App.-Dallas Apr. 6, 1998, pet. ref'd) (not designated for publication); *Ex parte Peyser,* No. 05–97–01606–CR, 1997 WL 775612, at *3, 1997 Tex.App. LEXIS 6469, at *9 (Tex.App.-Dallas Dec. 17, 1997, pet. ref'd) (not designated for publication); *Morgan v. State,* No. 05–94–01135–CR, 1996 WL 223551, at *4, 1996 Tex.App. LEXIS 1728, at *13 (Tex.App.-Dallas Apr. 30, 1996, pet. ref'd) (not designated for publication); *Lopez v. State,* 651 S.W.2d 830, 835 (Tex. App.-San Antonio 1983, pet. ref'd); *see In re Martinez,* No. 09–05–493 CV, 2006 WL 2439752, at *2, 2006 Tex.App. LEXIS 7459, at *5 (Tex.App.-Beaumont Aug. 24, 2006, no pet.) (mem. op.) (mental commitment); *Knipe v. Rector,* 463 S.W.2d 769, 771 (Tex. Civ.App.-Fort Worth 1971, no writ). Pena's objection is a typical shotgun objection. In holding that Pena's objection preserved a complaint, the majority's decision conflicts with other courts of appeals' decisions.

The majority holds, "If, as the State contends, the federal and state provisions are synonymous, then Pena's objection un-

---

**5.** The trial court warned Pena that Pena would have to put on evidence that the lost evidence would have been favorable, and Pena did not attempt to do so. The only evidence in that regard was Mott's testimony on examination by the trial court:

THE COURT: All right. Now, if you had not lost the material and it was here in court sitting on Mr. Montgomery's table

there would there be anything in your judgment that would be favorable to the defendant?

THE WITNESS: In my opinion, sir, if they would have it reanalyzed, if it were sitting there and had it reanalyzed the person doing it would come up with it's marijuana, sir.

(3 R.R. at 119.)

der the Texas Constitution was meaningless." *Pena* II, 226 S.W.3d at 637 (majority op.). Pena's objection may have been meaningless, for the reasons stated above, but would not have been for the reason stated by the majority. The majority's statement, besides being fallacious, conflicts with the applicable decisions of the Court of Criminal Appeals. That Court has held that the conflation of argument under the United States and Texas Constitutions does not signify an argument that the one provides a higher degree of protection than the other. *See Luquis v. State,* 72 S.W.3d 355, 364 (Tex.Crim.App.2002). The majority's argument is a non sequitur, moreover, in that the citing of both the United States and Texas Constitutions does not signify that either provides greater protection than the other, any more than Pena's also citing Texas statutes and rules signifies that the statutes and rules cited provide greater protections than the constitutions, or either of them. By the majority's reasoning, it would not be possible to cite two co-equal authorities for a legal proposition; one would necessarily trump the other. Pena argued that the United States Constitution, as well as the Texas Constitution, barred the evidence of which he complains. In this he was incorrect, under the authoritative interpretation of the United States Constitution by the United States Supreme Court; but that does not signify that the Texas Constitution provides greater protection than the United States Constitution.

For these reasons, we should overrule Pena's issues on remand.

## II. Harm

Further, the majority conducts no effective harm analysis. The majority's application of harmless-error law is as follows, in its entirety:

Having found a constitutional violation, we must next determine whether this error requires reversal. Under Rule of Appellate Procedure 44.2(a), such an error requires reversal "unless the court determines beyond a reasonable doubt that the error did not contribute to the conviction or punishment." Tex.R.App. P. 44.2(a); *see Pope v. State,* 161 S.W.3d 114, 121 (Tex.App.-Fort Worth 2004), *aff'd,* 207 S.W.3d 352 (Tex. Crim.App.2006); *Moore v. State,* 143 S.W.3d 305, 323 (Tex.App.-Waco 2004, pet. ref'd); *Fox v. State,* 115 S.W.3d 550, 563 (Tex.App.-Houston [14th Dist.] 2002, pet. ref'd).

Here, the error impacted the determination of Pena's guilt because it affected his ability to prove his contention that the plant material was something other than marihuana or that it amounted to a quantity less than charged in the indictment. *Cf. Nowling* [*v. State* ], 801 S.W.2d [182,] 184–85 [ (Tex.App.-Houston [14th Dist.] 1990, pet. ref'd) ]. Therefore, we cannot say beyond a reasonable doubt that the error did not affect Pena's conviction or punishment.

*Pena* II, 226 S.W.3d at 654–55 (majority op.).

"In conducting a harm analysis, the court of appeals must hand down an opinion that although brief, 'addresses every issue raised and necessary to final disposition of the appeal.' " *Long v. State,* 203 S.W.3d 352, 353 (Tex.Crim.App.2006) (quoting Tex.R.App. P. 47.1). The general rule is that "an appellate court must examine the record as a whole when engaged in a harmless-error review." *Miles v. State,* 204 S.W.3d 822, 828 (Tex.Crim.App.2006), *cert. denied,* —— U.S. ——, 127 S.Ct. 1496, 167 L.Ed.2d 230 (2007); *accord Davis v. State,* 203 S.W.3d 845, 852 (Tex.Crim.App. 2006), *cert. denied,* —— U.S. ——, 127 S.Ct. 2037, 167 L.Ed.2d 774 (2007); *San-*

*chez v. State,* 165 S.W.3d 707, 714 (Tex. Crim.App.2005); *Rich v. State,* 160 S.W.3d 575, 577–78 (Tex.Crim.App.2005); *Schutz v. State,* 63 S.W.3d 442, 444–45 (Tex.Crim. App.2001); *Llamas v. State,* 12 S.W.3d 469, 471 (Tex.Crim.App.2000). "Indeed, 'one can hardly evaluate the impact of an error upon a jury decision without considering the totality of the case before the jury.'" *Miles* at 828 (quoting W. LaFave et al., Criminal Procedure § 27.6(b), at 943 (2d ed.1999)). Moreover, "the evidence of the defendant's guilt is a factor to be considered in any thorough harm analysis." *Motilla v. State,* 78 S.W.3d 352, 358 (Tex.Crim.App.2002); *accord Wall v. State,* 184 S.W.3d 730, 746 (Tex.Crim.App.2006). "[W]e must 'judge the magnitude of the error in light of the evidence as a whole to determine the degree of prejudice to the defendant resulting from that error.'" *Jones v. State,* 119 S.W.3d 766, 777 (Tex. Crim.App.2003) (quoting *United States v. Polanco,* 93 F.3d 555, 562–63 (9th Cir. 1996)) (*Miranda* error). Moreover, in evaluating harm from constitutional error involving material, exculpatory evidence, the "*constitutional standard of materiality must impose a higher burden on the defendant*" than even the harmless-error rule. *United States v. Agurs,* 427 U.S. 97, 112, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976) (emphasis in orig.); *see Kyles v. Whitley,* 514 U.S. 419, 436, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995); *Turpin v. State,* 606 S.W.2d 907, 916 (Tex.Crim.App.1980).

In evaluating harm from constitutional error in the admission of evidence, "we review the entire record." *Simpson v. State,* 119 S.W.3d 262, 269 (Tex.Crim.App. 2003). "In the case of the erroneous admission of evidence, ... the appellate court should consider everything in the record, including any testimony or physical evidence admitted for the jury's consideration, the nature of the evidence supporting the verdict, the character of the alleged error and how it might be considered in connection with other evidence in the case, the jury instructions, the State's theory and any defensive theories, closing argument, voir dire, and whether the State emphasized the error." *Rich,* 160 S.W.3d at 577–78 (citing *Motilla,* 78 S.W.3d at 355–56). For example, in the context of evaluating harm from the constitutionally erroneous admission of evidence, the Court of Criminal Appeals has held that reviewing courts "should consider":

(1) "The importance of the" evidence "to the State's case;"

(2) "Whether the ... evidence was cumulative of other evidence;"

(3) "The presence or absence of evidence corroborating or contradicting the" evidence "on material points;"

(4) "The extent of" similar evidence "otherwise permitted;" and

(5) "The overall strength of the prosecution's case."

*Davis,* 203 S.W.3d at 850 (citing *Delaware v. Van Arsdall,* 475 U.S. 673, 684, 106 S.Ct. 1431, 89 L.Ed.2d 674 (1986)) (Confrontation–Clause error); *see also Shuffield v. State,* 189 S.W.3d 782, 791–92 (Tex.Crim. App.), *cert. denied,* — U.S. ——, 127 S.Ct. 664, 166 L.Ed.2d 521 (2006); *Byrd v. State,* 187 S.W.3d 436, 444 (Tex.Crim.App. 2005); *Johnson v. State,* 169 S.W.3d 223, 237 (Tex.Crim.App.2005), *cert. denied,* 546 U.S. 1181, 126 S.Ct. 1355, 164 L.Ed.2d 66 (2006).

Moreover, if the question is one of the denial of a jury instruction (one not requested), an *Almanza* egregious-harm analysis is required. *See Olivas v. State,* 202 S.W.3d 137, 143–44 (Tex.Crim.App. 2006); *Ex parte Smith,* 185 S.W.3d 455, 463–64 (Tex.Crim.App.2006) (orig. proceeding), *rev'd on other grounds sub nom. Smith v. Texas,* — U.S. ——, —— –

——, 127 S.Ct. 1686, 1697, 1698, 167 L.Ed.2d 632 (2007); *Almanza v. State*, 686 S.W.2d 157, 171 (Tex.Crim.App.1985) (op. on reh'g).

The majority conducts no effective harmless-error review. In so failing, the majority's decision conflicts with those of the Court of Criminal Appeals. I briefly note that a proper harm analysis would probably find any error harmless beyond a reasonable doubt. At several points in the majority's opinion, the majority writes as though there were no evidence of Pena's guilt other than the marihuana seized and Mott's report. The majority states that exclusion of Mott's testimony and report "would be tantamount to a an acquittal." *Pena* II, 226 S.W.3d at 655 n. 26 (majority op.). However, disregarding the evidence that the majority would exclude, the other evidence is sufficient and damning. In particular, a proper harm analysis would consider the arresting officer's expert testimony identifying the marihuana, and his photographs of the marihuana.[6] "A police officer's testimony, based on his experience and the characteristics of the substance, that the substance is marijuana is sufficient to establish the substance is marijuana as that term is defined in the Texas Controlled Substances Act." *Capuano v. State*, No. 05–04–01832–CR, 2006 WL 321964, at *4, 2006 Tex.App. LEXIS 1151, at *12 (Tex.App.-Dallas Feb. 13, 2006, no pet.) (not designated for publication) (citing *Carmouche v. State*, 540 S.W.2d 701, 703 (Tex.Crim.App.1976)); *accord Schillings v. State*, No. 12–03–00069–

CR, 2004 WL 1192634, at *3, 2004 Tex. App. LEXIS 4864, at *9 (Tex.App.-Tyler May 28, 2004, no pet.) (mem. op.) (not designated for publication); *see Jackson v. State*, 450 S.W.2d 616, 618 (Tex.Crim.App. 1970); *Miller v. State*, 168 Tex.Crim. 570, 572, 330 S.W.2d 466, 468 (Tex.Crim.App. 1959); *Walker v. State*, No. 05–01–00904–CR, 2003 WL 147730, at *1, *2, 2003 Tex. App. LEXIS 582, at *3, *5 (Tex.App.-Dallas Jan. 22, 2003, pet. ref'd) (not designated for publication). The officer testified unequivocally based on his experience that the marihuana was marihuana. The officer testified to the marihuana's weight, at over fifty pounds, the possession of which is a second-degree felony.[7] *See* Tex. Health & Safety Code Ann. § 481.121(b)(5) (Vernon 2003). The State charged Pena with the lesser included offense of possession of 23.46 pounds, based on Mott's report of the dry weight of the marihuana. The other evidence of the marihuana and its weight would probably render any error in the admission of Mott's testimony and report harmless beyond a reasonable doubt. For that reason, we should overrule Pena's issues on remand.

### III. ERROR

Although there are many parts of the majority's error analysis with which I disagree, I limit myself to the following few brief comments.

The majority's opinion again contradicts the holdings of the Court of Criminal Appeals. Texas law to the effect that the

---

**6.** Although reversing on the ground that the marihuana was not marihuana, the majority concedes that "the photographic evidence of the plant material and" the officer's "testimony would support a finding that Pena possessed marihuana on the occasion in question." *Pena* II, 226 S.W.3d at 654 (majority op.) (citing *Ward v. State*, 659 S.W.2d 643, 644–45 (Tex.Crim.App.1983)).

**7.** I note that Pena's possession of more than fifty pounds of marihuana could probably have been successfully prosecuted as delivery of marihuana, a first-degree felony. *See* Tex. Health & Safety Code Ann. § 481.120(a), (b)(5) (Vernon 2003). The State put on expert testimony that the bulk value of marihuana is as much as one thousand dollars per pound. (3 R.R. at 169.)

inadmissibility of lost potentially favorable evidence is conditioned on a showing of bad faith long predates the United States Supreme Court's interpretation of the United States Constitution to that effect in *Youngblood* in 1988 and affirmed as recently as 2004. *Arizona v. Youngblood,* 488 U.S. 51, 57–58, 109 S.Ct. 333, 102 L.Ed.2d 281 (1988); *see Illinois v. Fisher,* 540 U.S. 544, 124 S.Ct. 1200, 157 L.Ed.2d 1060 (2004); *Turpin,* 606 S.W.2d at 917; *Nastu v. State,* 589 S.W.2d 434, 441 (Tex. Crim.App. [Panel Op.] 1979); *Lake v. State,* 577 S.W.2d 245, 246 (Tex.Crim.App. [Panel Op.] 1979); *Patterson v. State,* 509 S.W.2d 857, 863 (Tex.Crim.App.1974); *Penix v. State,* 488 S.W.2d 86, 88–89 (Tex. Crim.App.1972). For example, in *Lake v. Texas* in 1979, the Court of Criminal Appeals held:

> It is true, as appellant argues, that a defendant should be given access to contraband for the purpose of analysis *when available.* There are instances, however, when it is not available, such as when it is lost or is destroyed in the process of analysis. Under such circumstances it is not error to convict for possession of drugs absent the physical presence of the drug itself, providing the drug has been analyzed and the chain of custody explicated. See *Montes v. State,* Tex.Cr.App., 503 S.W.2d 241[, 242–43 (1974) ]. In the instant case, the chemist who made the analysis was present and available for questioning as

were the officers who make the arrest and seizure and who could testify to the chain of custody. Of course, the state must not be allowed to purposefully or carelessly destroy evidence with an eye to harming a defendant, but there was no showing of bad faith on the state's part in this case.

*Lake,* 577 S.W.2d at 246 (emphasis in orig.) (some citations omitted). Here, as in *Lake,* the trial court found that the marihuana lost, that the marihuana had been analyzed, that the chain of custody was explained, and that there was no bad faith. It is for the jury to determine the credibility and weight of the oral testimony. *See* TEX.CODE CRIM. PROC. ANN. art. 36.13 (Vernon 1981); *Watson v. State,* 204 S.W.3d 404, 407–410 (Tex.Crim.App.2006); *Charles v. State,* 146 S.W.3d 204, 213 (Tex. Crim.App.2004); *Weatherford v. State,* 31 Tex.Crim. 530, 537, 21 S.W. 251, 252 (1893). In particular, "[w]ithout evidence of tampering, most questions concerning care and custody of a substance go to the weight attached, not the admissibility, of the evidence." *See Lagrone,* 942 S.W.2d at 617. Likewise, in *Turpin v. Texas,* the Court of Criminal Appeals found that under Texas law the State's failure to preserve specimens of the appellant's breath for analysis of their alcohol concentration did not constitute a violation of "due process generally" under Texas law. *Turpin,* 606 S.W.2d at 915.[8]

---

**8.** Although the trial court found the marihuana to be material, and the State does not contest that finding, it is not clear that the marihuana was material evidence under Texas law. In *Turpin,* for example the Court of Criminal Appeals held that, that Court "has expressly chosen to define 'materiality' under Texas law in the due process terms employed by the Supreme Court in *United States v. Agurs,* one of the more recent elaborations on the disclosure requirements of *Brady v. Maryland." Turpin,* 606 S.W.2d at 916 (quoting *Quinones v. State,* 592 S.W.2d 933, 941 (Tex.

Crim.App.1980)) (citing *Agurs,* 427 U.S. 97, 96 S.Ct. 2392; *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963)). By those terms, the Court of Criminal Appeals held that "test ampoules" containing specimens of the appellant's breath "used in administering the breathalyzer test" were not material in a prosecution for driving while intoxicated, where "any evidence gained upon remeasuring or retesting the ampoule would go only to the credibility of the [breathalyzer] machine's operator and test results." *Turpin*

The majority also contradicts the holdings of the Texas Supreme Court. "While the Texas Constitution is textually different in that it refers to 'due course' rather than 'due process,'" the Texas Supreme Court "regard[s] these terms as without meaningful distinction." *Nat'l Collegiate Athletic Ass'n v. Yeo*, 171 S.W.3d 863, 868 n. 14 (Tex.2005) (quoting *Univ. of Tex. Med. Sch. v. Than*, 901 S.W.2d 926, 929 (Tex.1995)); *see Mellinger v. City of Houston*, 68 Tex. 37, 44–45, 3 S.W. 249, 252–53 (1887). "As a result, in matters of procedural due process," that Court "ha[s] traditionally followed contemporary federal due process interpretations of procedural due process issues." *Yeo* at 868 n.14 (quoting *Than* at 929); *see Mellinger*, 68 Tex. at 44–45, 3 S.W. at 252–53.

Besides conflicting with the Court of Criminal Appeals' and Supreme Court's decisions, the majority's opinion conflicts with the decisions of the other courts of appeals. Every court of appeals that has considered the matter since the majority's vacated opinion has disapproved of that analysis. *See Alvarado v. State*, No. 07–06–0086–CR, 2006 WL 2860973, at *3, 2006 Tex.App. LEXIS 8696, at *8–*9 (Tex.App.-Amarillo Oct. 9, 2006, no pet.) (not designated for publication) (mem. op.); *In re Bowman*, No. 03–06–00183–CR, 2006 WL 2852495, at *1–*2, 2006 Tex.App. LEXIS 8902, at *3–*4 (Tex.App.-Austin Oct. 6, 2006, pet. ref'd) (not designated for publication) (mem. op.); *Gutierrez v. State*, No. 04–04–00790–CR, 2006 WL 542594, at *2, 2006 Tex.App. LEXIS 1761, at *5–*6 (Tex.App.-San Antonio Mar. 8, 2006, no pet.) (not designated for publication) (mem. op.); *Garcia v. State*, No. 04–05–00163–CR, 2006 WL 47046, at *2 n. 1, 2006 Tex.App. LEX-

IS 6816, at *6 n. 1 (Tex.App.-San Antonio Jan. 11, 2006, no pet.) (not designated for publication) (mem. op.); *Salazar v. State*, 185 S.W.3d 90, 92–93 (Tex.App.-San Antonio 2005, no pet.); *see also McGee v. State*, 210 S.W.3d 702, 705 (Tex.App.-Eastland 2006, no pet.).

Moreover, if, as Pena contends, he was in possession of "hemp," not marihuana, then his objection is of no effect. As Mott testified, "Hemp is marijuana." (3 R.R. at 119.) Such is the law, and such was the uncontradicted evidence at trial. "'Marihuana' means the plant Cannabis sativa L., whether growing or not," but "does not include ... the mature stalks of the plant or fiber produced from the stalks." TEX. HEALTH & SAFETY CODE ANN. § 481.002(26) (Vernon Supp.2006). "Marijuana ... is the dried leaves and flowering tops of a plant commonly known as hemp." *Capuano*, 2006 WL 321964, at *3, 2006 Tex.App. LEXIS 1151, at *9; *see Few v. State*, 588 S.W.2d 578, 581–83 (Tex.Crim.App. [Panel Op.] 1979); *Baker v. State*, 123 Tex.Crim. 209, 210, 58 S.W.2d 534, 534 (1933); *Capuano*, 2006 WL 321964, at *3, 2006 Tex. App. LEXIS 1151, at *10. Pena did not suggest to the trial court, and does not suggest on appeal, how proof that his marihuana was "hemp" would have affected his guilt.

*Ex parte Lewis* is a recent case in which the Court of Criminal Appeals decided that the Texas Constitution does not "impose[ ] a different standard than its ... counterpart" in the United States Constitution. *Ex parte Lewis*, 219 S.W.3d 335, 338 (Tex. Crim.App.2007) (orig. proceeding); *see id.* at 371. The majority treats *Lewis* as a

at 914, 916; *see id.* at 917–18; *Stone v. State*, 583 S.W.2d 410 (Tex.Crim.App. [Panel Op.] 1979); *Frank v. State*, 558 S.W.2d 12 (Tex. Crim.App.1977); *Perez v. State*, No. 13–97–024–CR, 1998 WL 34201915, at *3, 1998 Tex.

App. LEXIS 6819, at *8 (Tex.App.-Corpus Christi Oct. 29, 1998, pet. ref'd) (not designated for publication); *Russeau v. State*, 794 S.W.2d 816, 822 (Tex.App.-Tyler 1990, no pet.).

prescription for what factors should be considered in such an analysis:

In *Lewis,* the Court of Criminal Appeals overturned its prior holding in *Bauder v. State* that the Double Jeopardy provision (article I, section 14) of the Texas Constitution provides more expansive protection in a case involving a prosecutor-induced mistrial than the Double Jeopardy Clause of the federal constitution. The Court in so doing considered: (1) the historical context in which article I, section 14 of the Texas Constitution was framed, including: English common law, nineteenth century decisions in other states, prior versions of the Texas Constitution, and nineteenth century decisions in Texas cases; (2) more recent decisions in Texas and other jurisdictions; and (3) practical considerations.

*Pena* II, 226 S.W.3d at 638 (majority op.) (citing *Lewis,* 219 S.W.3d at 336–38 & *passim* ); *see* U.S. CONST. amend. V; TEX. CONST. art. I, § 14; *Bauder v. State,* 921 S.W.2d 696 (Tex.Crim.App.1996), *overruled, Lewis,* 219 S.W.3d 335. Although at least some of the factors that *Lewis* considers would no doubt be relevant, the Court of Criminal Appeals does not offer *Lewis* as a prescription for such an analysis. In any event, the majority's analysis of "practical considerations" does not appear to be at all what the Court of Criminal Appeals has in mind by that term. *Compare Pena* II, 226 S.W.3d at 647–51 (majority op.) *with Lewis* at 353, 360–71. Moreover, I expect that, as the Court of Criminal Appeals sometimes finds in *Lewis,* that here "supporting evidence simply does not exist" as to some of the majority's factors. *See Lewis* at 354. To whatever extent that due course of law expanded, it was because the expansion was in step with the expansion of due process of law. *See* 1 GEORGE D. BRADEN ET AL., THE CONSTITUTION OF THE STATE OF TEXAS: AN ANNOTATED AND COMPARATIVE ANALYSIS 67–73 (1977).

As the majority concedes, "The historical backdrop for the Due Course of Law provision in the Texas Constitution demonstrates that the framers intended for this provision to be interpreted consistent with the Due Process Clause of the federal constitution." *Pena* II, 226 S.W.3d at 650 (majority op.). In light of that, most of the majority's analysis appears superfluous.

Lastly, we should probably not decide the matter of the remedy in the first instance, but should probably leave it to the trial court to decide. *See Ex parte Rich,* 194 S.W.3d 508, 515 (Tex.Crim.App.2006) (orig. proceeding.) Indeed, all of the cases that the majority cites for its remedy of a mandated instruction hold that the trial court has discretion in choosing a remedy. *See State v. Fain,* 116 Idaho 82, 774 P.2d 252, 266–67 (1989), *limited on other grounds, State v. Paz,* 118 Idaho 542, 798 P.2d 1, 12 (1990); *State v. Ferguson,* 2 S.W.3d 912, 917 (Tenn.1999); *cf. Pena* I, 166 S.W.3d at 282. The majority, however, prefers the legislative function of making law over the proper appellate judicial function of reviewing trial courts' actions for error.

## CONCLUSION

Accordingly, we should overrule Pena's issues on remand and reach issues on original submission. Because the Court does otherwise, I dissent.